THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROCCO ROPPO *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—90—0157, 1—90—0223 cons.

Opinion filed June 12, 1992.

Robert A. Novelle, of Serpico, Novelle, Dvorak & Navigato, Ltd., of Chicago, for appellant Rocco Roppo.

Randolph N. Stone, Public Defender, of Chicago (Crystal H. Marchigiani, Assistant Public Defender, of counsel), for appellant Ernie Steinbach.

Jack O'Malley, State's Attorney, of Chicago (Carol Gaines, Special Assistant State's Attorney, and Renee Goldfarb and Nicholas C. Giordano, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

This appeal arises from three consolidated cases. Following a joint bench trial, defendants, Jeffrey Karas, Ernest Steinbach and Rocco Roppo were each convicted of delivery of a controlled substance in violation of section 401(a)(2) of the Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)). Each defendant was sentenced to six years' imprisonment. All three defendants have appealed, but we consider only the contentions of Steinbach and Roppo (hereinafter defendants). Karas has filed an *Anders* motion.

On appeal, defendants contend that statements made by Karas implicating them were improperly admitted into evidence as coconspirator exceptions to the hearsay rule, and that the State failed to prove beyond a reasonable doubt that defendants were accountable for the actions of codefendant Karas. Steinbach further contends that the indictment against him should have been dismissed by the trial court.

At the commencement of the proceedings, the judge granted a *"de facto* severance," and stated that he would not "consider any out-of-court statements made by one defendant against another defendant for no person can admit or confess a crime for another."

The following facts were adduced at trial. Officer David Spahn, an undercover agent with the Northeastern Metropolitan Enforcement Group (MEG), testified on behalf of the State that on August 12, 1987, he spoke with Karas to arrange the purchase of a quarter ounce of cocaine. After agreeing to a price for the cocaine, Karas and Spahn arranged to meet the following day at Copperfield's Lounge in Berwyn, Illinois.

On August 13, 1987, Spahn met with Karas at Copperfield's. The two men went to Spahn's car, and Karas handed Spahn the cocaine in a clear plastic packet. Spahn prerecorded the serial numbers of the money used in the transaction. Karas informed Spahn that he would be able to provide more cocaine for future transactions.

On August 26, 1987, at approximately 9 a.m., Spahn telephoned Karas and asked for another quarter ounce of cocaine. Karas indicated that he would be able to provide the cocaine later that day and arranged to again meet Spahn at Copperfield's. Spahn also inquired whether Karas would be able to provide prices for larger quantities of cocaine.

Surveillance officers positioned outside the building indicated that Karas arrived by commuter train at approximately 5:30 p.m. Spahn entered Copperfield's and observed Karas at the bar. Spahn and Karas walked over to a table in the lounge. Karas told Spahn that "his main guy or his connect" was on the way to the lounge with the cocaine. After Karas made a telephone call, he informed Spahn that he just talked to his "main guy." According to Karas, his "connect" had a car phone in his Corvette and was employed in the computer business.

Approximately 30 minutes later, Karas made another telephone call. Karas told Spahn that his "guy" was approximately five minutes away. Spahn called the surveillance agents positioned outside the lounge and told them that the "connect" on the deal was supposed to be arriving and that he would probably be driving a Corvette with a car antenna. Shortly thereafter, Steinbach arrived and approached Spahn and Karas. Karas told Spahn that this was his "main connect" and introduced Steinbach to Spahn.

Steinbach directed Karas to accompany him to his car. Karas explained to Spahn that he would be right back with the cocaine. After Karas and Steinbach left the lounge, Spahn placed a telephone call to

the surveillance agents and advised that Karas and his "connect" were walking out the door. Surveillance Agent Fred Guerra, also employed by the MEG, testified that he saw Karas and Steinbach leave the lounge and enter Steinbach's car. Karas drove Steinbach's car away from the parking lot, while Steinbach sat in the passenger seat. After driving around the block, the car returned to the parking lot. Steinbach and Karas then reentered the lounge.

Karas and Steinbach walked back to Spahn's table, and Karas told him that "it" would cost $460. At that moment, Steinbach told Karas to "hold on" and walked approximately four to five feet away from Spahn and Karas. Karas handed Spahn a packet of white powder, which Spahn paid for with prerecorded money. After the transaction, Steinbach drove away in his car with Karas in the passenger seat.

At approximately 8 p.m. that evening, Spahn received a page from Karas. Karas informed him that he was with his "main connect," and that they would be able to sell him eight ounces of cocaine at $1,500 per ounce. Spahn arranged to meet with Karas at the Burger King in Berwyn the following afternoon. Karas stated that if everything went well with this drug deal, Spahn could purchase larger amounts at a later date. Karas further stated that his "connect, his main guy, was very smart and would not be there to do the deal because he did not want the dope and the money together." However, the "connect" would be a few blocks away.

On August 27, 1987, Spahn drove to the Burger King at approximately 1 p.m. Agent Guerra was one of the team performing surveillance outside the restaurant. Spahn received a page from Karas, who informed him that the site of the deal was being changed to the Jewel Food Store parking lot in Hillside. After notifying the surveillance team of the location change, Spahn proceeded to the Jewel parking lot. Agent John Majcher of the MEG testified that he saw Steinbach leave the vicinity of the Jewel parking lot and drive northbound on Mannheim Avenue.

Spahn arrived at the Jewel parking lot and dialed the number he previously used to call Karas. Karas did not answer the telephone; rather, Spahn testified that he recognized the voice of Steinbach. Spahn asked Steinbach where Karas was because they were "supposed to do this deal." Steinbach replied that Karas just left and that he should be right over.

Karas pulled next to Spahn's car in the Jewel parking lot. After exchanging greetings, Karas stated that he needed to have the money first so that he could drive over to where his "connect" and his "connect's connect" were waiting. Spahn refused to provide the money

until he was able to see the drugs. After several minutes of negotiations, Karas stated that he would go talk to both of them, as they were sitting in a nearby Wendy's parking lot. After Karas' departure, Spahn notified the surveillance agents so that they could follow him.

Majcher testified that he saw Karas' car pull up and park perpendicular to the front end of a black Corvette driven by Roppo. The Corvette was owned by Roppo's brother. Steinbach's Corvette was also in the parking lot. Karas walked around to the driver's side of the car, where Roppo was seated. Steinbach was in the passenger seat. Karas conversed with Roppo for approximately 10 minutes. From a distance of approximately six or seven feet from Roppo's car, Majcher observed an object being passed out of the vehicle to Karas, who concealed the object in his right hand and then reentered his car. Specifically, Majcher testified that he saw Roppo's hand coming out of the vehicle and meeting Karas' hand, and that an object was passed between those two hands.

Shortly thereafter, Karas returned and entered Spahn's car. Karas stated that he had one ounce of "good coke." Karas took out a clear plastic bag containing white powder and stated that in order to get the rest of the cocaine Spahn had to give him all the money. Spahn refused to give Karas the entire amount and eventually activated a signal to the arrest team. Spahn then dropped a handful of bills into Karas' lap to distract him so that he would not see the approach of the arresting officers. At the same time, another team arrested Steinbach and Roppo in Roppo's car in the nearby Wendy's parking lot. After searching Roppo's car, the agents recovered a revolver underneath the seat, and $662 upon Roppo. Steinbach's car was also searched, but nothing was seized.

Under cross-examination, Spahn stated that he had never heard Roppo's name nor had he spoken to him prior to the arrest. The plastic bag containing the cocaine was not examined for fingerprints.

The parties stipulated to the amount of cocaine recovered from each transaction. From the August 13, 1987, transaction, 6.9 grams of cocaine were recovered; 8.9 grams were recovered in the August 26, 1987, transaction and 28.1 grams in the final transaction on August 28, 1987.

After hearing the testimony from Agents Spahn, Guerra and Majcher, the judge denied Steinbach's motion to dismiss the indictment. Additionally, the judge denied all three defendants' motions for a directed finding. At that time, the judge also stated that he would not consider any post-arrest statements made by any defendant against a codefendant; however, he would consider any statements made by

Karas pertaining to an agreement against his codefendants. Defense counsel objected on the basis that there was an insufficient foundation for the admission of such statements. The court found that the State had established an agreement between the defendants for the delivery of a controlled substance by a preponderance of the evidence, independent of Karas' statements.

Steinbach testified that he had been a friend of Karas for over three years prior to August 1987. At that time, Steinbach worked as a computer salesman. On August 13, 1987, Karas telephoned Steinbach in his car and asked for a ride from Copperfield's. Karas called Steinbach a second time to give him directions to the bar because Steinbach was unfamiliar with that neighborhood. After parking the car, Steinbach walked into the bar and saw Karas sitting at a table with another man. After ordering a drink, Karas introduced him to Spahn and they had a brief conversation. There was no discussion of any deals. Steinbach and Karas then left the bar. Steinbach asked Karas to drive because he was tired; however, they left the bar and returned momentarily because Karas stated that he had to go back into the bar for a minute. Steinbach accompanied Karas back into the bar to use the restroom. Karas spoke briefly with Spahn, and they then left the bar.

Steinbach further testified that on August 27, 1987, Karas was staying with him at his apartment. Steinbach drove Karas to a friend's house to borrow a car. While in the car, Karas made a telephone call to a friend's beeper number. Approximately two minutes later, Karas received a telephone call. Thirty minutes after Steinbach dropped Karas off, Steinbach received another telephone call on his car telephone and someone asked for Karas. Steinbach replied that he had dropped Karas off a half hour ago, and that if Karas was supposed to meet him, he was probably on his way.

Steinbach met with Roppo at a restaurant on Mannheim Road to discuss a computer purchase. Roppo suggested that they have lunch at Wendy's across the street. Steinbach entered Roppo's car and rode with him to the restaurant parking lot. After approximately one-half hour, Karas approached Roppo's car. After a brief conversation, Karas shook Steinbach's hand. Karas then returned to his car and drove away. Shortly thereafter, Steinbach and Roppo were arrested.

On appeal, we first address whether the statements made by Karas to Spahn implicating defendants were properly admitted into evidence as coconspirator exceptions to the hearsay rule. Defendants argue that the trial judge's admission of such statements constitutes reversible error in light of his ruling at the beginning of trial that he

would not "consider any out-of-court statements made by one defendant against another defendant." Further, defendants maintain that the State failed to establish the existence of a conspiracy by nonhearsay evidence.

In order to establish a *prima facie* case for any conspiracy, the State is required to prove that two or more persons intended to commit a crime, that they engaged in a common plan to accomplish the criminal goal, and that an act or acts were done by one or more of them in furtherance of the conspiracy. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Mere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt; however, presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy. *United States v. Xheka* (7th Cir. 1983), 704 F.2d 974.

■ Under the coconspirators' exception to the hearsay rule, any act or declaration (1) by a coconspirator of a party (2) committed in furtherance of the conspiracy and (3) during its pendency is admissible against each and every coconspirator, provided that (4) a foundation for its reception is laid by independent proof of the conspiracy. (*People v. Goodman* (1980), 81 Ill. 2d 278, 408 N.E.2d 215; *People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103.) Declarations of a coconspirator made in furtherance of and during the pendency of a conspiracy are admissible against all conspirators upon an independent, *prima facie* evidentiary showing of a conspiracy between the declarant and other defendants (*People v. Duckworth* (1989), 180 Ill. App. 3d 792, 536 N.E.2d 469) which occurs either before or after the alleged hearsay testimony. (*People v. Goodman*, 81 Ill. 2d 278, 408 N.E.2d 215.) The *prima facie* case must show that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach a common end by criminal means. *People v. Edwards* (1984), 128 Ill. App. 3d 993, 471 N.E.2d 957.

The testimony of an undercover police officer can serve as circumstantial evidence that a conspiracy to deliver narcotics existed and that defendant was an integral part of that conspiracy where out-of-court coconspirator statements which directly implicate others in the conspiracy are interspersed in his testimony. (*People v. Cortes* (1984), 123 Ill. App. 3d 816, 463 N.E.2d 885.) In that case, the undercover officer's testimony as to what the codefendant told him about defendant's involvement in a narcotics transaction was admissible as the statement of a coconspirator and served as circumstantial evidence

that a conspiracy to deliver heroin existed and that defendant was an integral part of that conspiracy.

For purposes of our analysis, we also find it instructive to turn to Federal Rule of Evidence 801(d)(2)(E) (28 U.S.C. 801(d)(2)(E) (1976)), which provides that:

"A statement is not hearsay if—
***

*** [t]he statement is offered against a party and is *** a statement by a coconspirator of a party during the course of and in furtherance of that conspiracy."

In the landmark case of *Bourjaily v. United States* (1987), 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775, the Supreme Court held that under Rule 104(a) of the Federal Rules of Evidence, a court is permitted to consider out-of-court statements of an alleged coconspirator when making its preliminary factual determinations, relevant to the statement's admissibility against the accused under Rule 801(d)(2)(E) as to whether a conspiracy existed and whether the accused and the declarant were members of such a conspiracy. Additionally, the *Bourjaily* court held that where there is a dispute as to such preliminary facts, the party offering the out-of-court statements must prove those facts by a preponderance of the evidence, but not by a higher standard of proof. In Illinois, Federal Rule of Evidence 801(d)(2)(E) is basically the same as the common law rule in Illinois. *People v. Eddington*, 129 Ill. App. 3d 745, 473 N.E.2d 103.

Admittedly, the trial judge's initial statement that he would not consider the out-of-court statements made by one defendant against another codefendant may have caused some confusion as to whether pre-arrest statements were admissible. However, the judge's comment that *"no one person can admit or confess a crime for another"* strongly suggests that he was considering statements made after the commission of the offense only, which comports with a long line of cases holding that statements made by an alleged coconspirator upon confession or after arrest are not admissible against a defendant unless made in his presence and assented to by him. (Emphasis added.) (See *People v. Eddington*, 129 Ill. App. 3d 745, 473 N.E.2d 103; *People v. Brown* (1972), 7 Ill. App. 3d 748, 289 N.E.2d 452; *People v. Simpson* (1976), 39 Ill. App. 3d 318, 349 N.E.2d 441.) No man can confess to a crime for anyone but himself. (*People v. Eddington*, 129 Ill. App. 3d 745, 473 N.E.2d 103, citing *People v. Rupert* (1925), 316 Ill. 38, 146 N.E. 456.) After defendants' motions for directed findings, the judge further clarified his position that he would not consider any post-arrest statements, but that he would consider any statements

made by Karas pertaining to an agreement against the other codefendants.

■■ We find that other independent evidence was introduced at trial to support the State's position that a conspiracy existed, between Karas and Steinbach, at least. Specifically, we point to the testimony of Guerra, who stated that at the second drug transaction Steinbach entered the lounge, approached Karas and Spahn, and then left the lounge. Karas drove away from the parking lot in Steinbach's car, who was in the passenger seat. The two men drove around the block, and then reentered the lounge. Upon their reentry, Karas sold Spahn the packet of cocaine for $460. We also consider the testimony of Majcher, who saw Steinbach leave the vicinity of the Jewel parking lot at the prearranged time for the third drug transaction. Finally, we note the presence of Steinbach in Roppo's car, in close proximity to the area where Karas delivered the cocaine to Spahn during the third drug transaction.

The existence of the agreement may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the accused. (*People v. Pintos,* 133 Ill. 2d 286, 549 N.E.2d 344; *People v. Gray* (1980), 85 Ill. App. 3d 726, 410 N.E.2d 493.) Accordingly, we find that sufficient independent proof of the conspiracy existed to allow for the admission of Karas' statements as coconspirator's exceptions to the hearsay rule.

We now address whether sufficient evidence existed to prove beyond a reasonable doubt that Steinbach and Roppo were accountable for the delivery of the controlled substance by Karas.

The critical inquiry on review of a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.) Once defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that, upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Migliore* (1988), 170 Ill. App. 3d 581, 525 N.E.2d 182.

We first address Steinbach's arguments. Steinbach asserts that he was merely present on one of three occasions when Karas sold cocaine to Spahn, and merely present at another location when Karas met Roppo before he sold cocaine to Spahn at a separate location; as such, his actions in each instance demonstrated disapproval, and not his acquiescence.

■ To sustain a conviction for unlawful delivery based upon an accountability theory, the State must establish beyond a reasonable doubt that: (1) defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the delivery; (2) that the defendant's participation took place before or during the commission of the delivery, and (3) that the defendant had the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) Defendant's mere presence at the crime scene and knowledge of an on-going offense is not, alone, sufficient to establish accountability (*People v. Deatherage*, 122 Ill. App. 3d 620, 461 N.E.2d 631; *People v. Schlig* (1983), 120 Ill. App. 3d 561, 458 N.E.2d 544); nevertheless, the fact finder may infer defendant's accountability from his approving presence at the scene of the crime (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 415 N.E.2d 502), and from evidence of conduct showing a design on defendant's part to aid in the offense. *People v. Schlig*, 120 Ill. App. 3d 561, 458 N.E.2d 544.

■ Viewed in the light most favorable to the prosecution, specific actions undertaken by Steinbach evidence his intent and participation in assisting Karas in the delivery of the cocaine. Although Steinbach was not involved in the August 13 transaction, he participated in the following two drug deliveries. Karas told Spahn that "his main guy or his connect" was on the way to Copperfield's with the cocaine. Karas further told Spahn that his "connect" had a car phone in his Corvette and was employed in the computer business. Guerra testified that shortly after Karas's second telephone call, Guerra saw Steinbach drive his Corvette into the Copperfield's parking lot and meet with Karas and Spahn. Karas and Steinbach then left the bar, drove around the block once, and reentered the building. Thereafter, Karas exchanged a packet of cocaine for $460 provided by Spahn. We are unimpressed by Steinbach's attempt to distance himself from the transaction by asking Karas and Spahn to "hold on" and walking four to five feet away from the table.

As previously discussed, we note that Steinbach was present at the prearranged time and location in the Jewel parking lot immediately prior to the third drug transaction. When Spahn dialed the pager number he previously used to call Karas, Steinbach answered the call. After Spahn asked where Karas was, because they were "supposed to do this deal," Steinbach replied that Karas had just departed and that he would be right over. Finally, the trial judge had the opportunity to assess the credibility of Steinbach's account that he was meeting with Roppo at a restaurant on Mannheim Road to dis-

cuss a computer purchase, and that the conversation continued in the Wendy's restaurant parking lot across the street.

Accordingly, we find that the State presented sufficient evidence to prove beyond a reasonable doubt that Steinbach was accountable for the actions of Karas in the delivery of a controlled substance.

We now address the issue of the evidence presented against Roppo. Roppo contends that he was only present at a public place with Steinbach when Karas approached the car after having left Spahn. Majcher testified that he observed an object being passed out of the vehicle from Roppo's hand to Karas, who concealed the object in his right hand and then reentered the car. Shortly thereafter, Karas delivered the cocaine to Spahn at a different location. In essence, Roppo argues that the State's evidence demonstrates presence and nothing more; as such, his conviction must be reversed.

In *People v. Darnell* (1990), 214 Ill. App. 3d 345, 573 N.E.2d 1252, this court examined a factual pattern similar to the present case. In that case, Darnell made several statements to an undercover agent in which he referred to his codefendants, Velez and Swiatkowski. Specifically, Darnell referred to one of his codefendants as his cocaine source, and also stated that Swiatkowski did not want the cocaine and the money in the car at the same time. Additionally, Velez handed a white shopping bag which was found to contain cocaine to Darnell from the front seat of his car. This court affirmed Darnell's conviction, but reversed those pertaining to Velez and Swiatkowski, finding that the State presented no evidence to support its assertion that the codefendants knew a crime was being committed, and that any implication that Swiatkowski was a supplier was purely speculative and not supported by the evidence.

●5 In the present case, the State failed to prove that Roppo was accountable for the actions of Karas in the delivery of a controlled substance. Roppo was not present, nor was his name mentioned at either of the first two drug transactions between Karas and Spahn. Indeed, Spahn testified that he had never heard Roppo's name nor had he spoken with him prior to the arrest. The most incriminating evidence against Roppo is Majcher's testimony that he saw Roppo pass an "object" in his right hand to Karas prior to the time that Karas made the third delivery of cocaine to Spahn. However, Majcher was unable to state precisely what that object was, nor did the agents attempt to recover Roppo's fingerprints from the plastic bag of cocaine which Karas delivered to Spahn. Search of Roppo's car after the arrest did not produce the other seven ounces of cocaine which were supposed to be used in the transaction. Even considering Karas'

statement to Spahn that his "connect and his connect's connect" were waiting in a nearby Wendy's parking lot, we find the evidence against Roppo insufficient to support the State's position that Roppo aided or participated in Karas' delivery of cocaine to Spahn.

■ Finally, we turn to Steinbach's contention that the State should have dismissed the indictment against him because Spahn's testimony before the grand jury was misleading. In particular, Steinbach complains that Spahn testified before the grand jury that he had a telephone conversation on August 27, 1987, regarding narcotics. However, at trial, Spahn testified that in his conversation with Steinbach he said they were meeting over "this deal."

Steinbach correctly asserts that a court may properly dismiss an indictment based upon perjured testimony (See *People v. Shaw* (1985), 133 Ill. App. 3d 391, 478 N.E.2d 1142; *People v. Rivera* (1979), 72 Ill. App. 3d 1027, 390 N.E.2d 1259); nonetheless, a court must proceed with restraint in ascertaining due process violations in indictment procedures and should dismiss an indictment only when the violation is clear and has been found with certainty. (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244; *People v. Bragg* (1984), 126 Ill. App. 3d 826, 467 N.E.2d 1004.) While Spahn's testimony that the August 27 conversation concerned narcotics may have been a slight misstatement, we do not find that it rises to the level of perjury. Therefore, we find the trial court was not required to dismiss the indictment against Steinbach.

For the foregoing reasons, the judgment of conviction of the circuit court of Cook County as to Steinbach is affirmed; the judgment of conviction as to Roppo is reversed.

Affirmed in part; reversed in part.

EGAN, P.J., and RAKOWSKI, J., concur.