THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNIE BUFFMAN *et al.*, Defendants-Appellants.

First District (4th Division)   Nos. 1—91—2658, 1—92—0399 cons.

Opinion filed March 31, 1994.

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael McCaughey O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court:

Defendants, Johnnie Buffman, Dorothy Murphy, and Iris Colar, were charged along with 16 codefendants with, *inter alia*, multiple counts of insurance fraud (Ill. Rev. Stat. 1985, ch. 73, par. 1101) and conspiracy to commit theft (Ill. Rev. Stat. 1985, ch. 38, pars. 8—2, 16—1), arising from an elaborate automobile insurance scam involving Country Companies Insurance Company and Allstate Insurance Company. In a consolidated bench trial, the court found all three defendants guilty of conspiracy and also found Buffman guilty of one count of insurance fraud, and found Murphy and Colar guilty of three counts of insurance fraud. On appeal, we address: (1) whether a proof of loss statement submitted by Buffman to Country Companies was hearsay and thus improperly admitted, and (2) whether the State failed to prove all three defendants guilty beyond a reasonable doubt.

John Bauer, a Country Companies claims adjuster, testified that in July of 1987 he received a call reporting a collision between a 1981 Volvo and a 1987 Cadillac. The caller stated that Sam Kapleton, a codefendant, had been driving the Volvo and that Iris Colar and Doro-

thy Murphy were passengers. Bauer testified that the Volvo was covered under a "binder" policy issued on June 26, 1987, to Johnnie Buffman. Bauer also received injury claims from passengers supposedly in the Cadillac, which was reportedly owned and driven by another codefendant, Connie Taylor.

In the course of a routine investigation of the claim, Bauer attempted to contact Buffman and Kapleton. Although a woman identifying herself as Buffman eventually returned Bauer's call, it was later learned that the caller was not Buffman but was the wife of a co-conspirator, Terry Brooks. Bauer also learned that the Cadillac which supposedly had belonged to Taylor in fact had been reported as stolen from a rental car company. Bauer spoke with Taylor and her alleged passengers and testified that when he cross-referenced the telephone numbers they gave him, he discovered that they were registered to an address in the 3300 block of West Crystal Street in Chicago.

Bauer testified that on July 24, 1987, a woman claiming to be Murphy presented medical documentation and signed a medical authorization form regarding her injuries from the collision. Although one of the bills bore the name and telephone number of "Westgate Medical Center," Bauer discovered that the number did not belong to a medical facility, but to a party at the 3300 West Crystal Street address. Bauer was unable to determine that any Westgate center existed.

Country Companies retained an independent adjusting firm, Adjus Tech Investigation Services, to conduct an investigation into the claim. Adjus Tech investigator Timothy Thomas testified that in July or August of 1987 he interviewed Kapleton, Murphy, and Colar independently. Each claimed to have been involved in the accident and furnished details about it. Kapleton stated that he had been driving Johnnie Buffman's car and that Colar and Murphy were his passengers. Kapleton also described where each of these individuals was supposedly seated in the vehicle during the accident. Both Murphy and Colar indicated that they were riding with Kapleton, and Murphy described each of their respective positions in the car. Colar told Thomas that there had been injuries. Both Murphy and Colar showed Thomas their driver's licenses and provided their social security numbers.

The parties stipulated that on September 9, 1987, Buffman executed a "proof of loss" statement for the collision. The statement, which was admitted into evidence over objection, provided that the driver at the time of the collision was "Kapleton," and that his purpose was "pleasure." Bauer testified that Country Companies

would not issue a settlement check for a claim unless it had the proof of loss statement. He indicated that the statement would typically be prepared within the insurance company before the claimant signed it, and further testified that Buffman's statement was probably completed at the time she executed it although he could not be certain of this. Observing the document at trial, Bauer noted that it was complete except for the agency location, which he indicated would normally not be filled out. Bauer also noted that the document had not been notarized or witnessed.

Bauer testified that on September 16, 1987, Country Companies issued Buffman a check for over $4,091 for the claim. Country Companies also paid $300 to Enterprise Leasing Company to cover automobile rental. The parties stipulated that Buffman had endorsed and cashed the settlement check.

The central figures in the conspiracy, Mozell Brown and Terry Brooks, testified that they and another defendant, Johnnie Little, earned a living in 1987 by setting up phoney accidents and collecting insurance proceeds. Brooks testified that he orchestrated three or four accidents per week and solicited various other individuals to participate in each one. Brooks maintained detailed records of each staged collision.

Brown testified that in June or July of 1987, Kapleton inquired whether he "had anything going." Brown replied that he did and that Kapleton would simply have to go to the police station and report an accident and visit his physician the following morning. Brown told Kapleton that Brooks had obtained a 1981 Volvo from Buffman which Kapleton would be "driving," and that the car would collide with a 1987 maroon Cadillac.

Brown testified that about this same time, he and Brooks met with Murphy, whom Brown had known because of a close friendship between their sons. Brown asked Murphy to rent a car for his son in exchange for $300, indicating that $179 of this amount would go to cover the rental and that she could keep the balance. Brown denied ever telling Murphy that they planned to use the car in a fake accident. After Murphy agreed to rent the car, she went to O'Hare airport with Brown and Brooks and rented a maroon 1987 Cadillac. She then turned the car over to Brooks, who drove it away.

The following evening Brown and Brooks returned to Murphy's home and this time spoke with Colar, Murphy's roommate. Brown testified that after some persuading, Brooks convinced Colar to rent a car, later shown either to be a Cadillac or a Lincoln, in exchange for $300. Brown testified that he never told Colar about a plan to use the car in an accident.

Brown indicated that several days later, the rental cars were used in staged accidents without Murphy's or Colar's knowledge. He then returned to Murphy and Colar's home and told Colar that one car had been stolen and that she should inform the police that it had been taken from a department store parking lot. Brown testified that Colar subsequently filed a police report to this effect. After a few more days, Brown and Brooks told Murphy and Colar that a friend had had an accident and inquired whether they would like to make some money from it. Although initially very reluctant, Murphy and Colar eventually gave Brown their insurance cards to use in the accident scam after learning that their participation could earn them "millions" of dollars.

Brown testified that he and Brooks subsequently informed Murphy and Colar that the case had "gone sour" because the insurance company was reluctant to pay, and that an investigator would be visiting them. Brown then instructed them as to the details of the alleged accident and their role in the scam. According to Brown, neither woman ever actually went to the hospital or submitted fraudulent bills; these matters were handled by Brooks. He also testified that neither of the women ever received payment.

Brown testified as to how the Volvo and Cadillac were actually damaged. He indicated that he had reported the claim to Country Companies and that the proceeds for the accident were later divided between Brooks, Little, and others.

Co-conspirator Terry Brooks testified that in early July, he had spoken with Buffman about the proposed scheme. Buffman stated that her Volvo was giving her trouble and that she wanted to buy a new car. Brooks told her that he would pay for insurance for the car, that another individual would drive it in the fake collision, and that Buffman would receive a portion of the insurance proceeds. Brooks subsequently accompanied Buffman to procure the insurance, and at some point thereafter, he picked up the Volvo from Buffman's home. He never saw Buffman again. The subsequent claim was called in to Country Companies by Brooks' wife impersonating Buffman, who was on vacation.

Brooks identified Murphy and Colar as claimants in the Country Companies scheme. Their role was to "go into the hospital," and then collect one-third of the settlement proceeds. Brooks was unsure whether Murphy or Colar actually went to the hospital, but testified that they did send Brown forged medical bills which were submitted to Country Companies. Brooks testified that Brown was "lying" when he testified that Murphy and Colar never saw the bills and that they never knew what was going on.

Brooks also testified regarding a similar fraudulent claim against Allstate, perpetrated by several codefendants who are not parties to this appeal. Brooks testified that in this supposed accident, they used the Cadillac which had been rented by Colar. However, there was no testimony that Colar or Murphy made a claim in this accident.

Police officer John Lucki, who investigated the alleged scams, testified regarding his interviews with Colar and Murphy. Colar denied being involved in any accident but indicated that a claim in her name had been filed with Country Companies. Colar explained that she had been introduced to Brown and Brooks in July of 1987 and that these men had solicited her and Murphy to rent automobiles for them. The four had driven to O'Hare airport, where Murphy rented a car and turned it over to Brooks in exchange for $300. They subsequently went to Midway airport and rented another car which they also turned over to Brooks. Brooks later directed Colar to report the car as having been stolen from a store parking lot. Several days later Brown and Brooks convinced Colar to participate in a claim against Country Companies, and Colar subsequently submitted a statement to that company. Colar told Lucki that although she received some compensation for her participation, she never received insurance proceeds. Lucki indicated that Colar denied being involved in any other such claims.

Lucki testified that Murphy said she had been involved in an accident resulting in a claim to Country Companies. She told him that she had been riding in the back seat of a Volvo but she could not recall the type of vehicle with which they collided. When Lucki inquired whether it was one she had rented, Murphy was "taken aback," and then conceded that the accident did not happen. Murphy stated that she reported the car as stolen to police.

Murphy and Colar presented no evidence. The court found them guilty of conspiracy to commit theft and stated that the remaining counts, which included three counts of insurance fraud, merged into the conspiracy count.

Buffman testified on her own behalf and denied being aware of a conspiracy or ever meeting Brooks or Brown. She testified that at the time of the staged accident she was on a cruise and had left her Volvo for a friend to pick up. Buffman believed her friend was going to have the headlights repaired and drive the car for her own purposes. Buffman did not testify as to how the damage occurred. She admitted signing the proof of loss form, but stated that at the time she signed it, the portions seeking the name of the driver at the time of the collision, his age, and the purpose he was driving the car were blank. She also admitted that she claimed damages of $4,591, but said that the insurance company had supplied this figure.

Following arguments, the court found Buffman guilty of conspiracy to commit theft and insurance fraud.

■ The first argument on appeal is raised by Buffman, who contends that the admission of her proof of loss statement was reversible error because it was inadmissible hearsay. The State responds that the statement was not hearsay or, alternatively, that it was admissible either as a business record or an admission of a party.

The determination as to the admissibility of evidence is within the discretion of the trial judge, whose ruling will not be overturned unless an abuse of discretion is clearly evident. *People v. Hayes* (1990), 139 Ill. 2d 89, 130, 564 N.E.2d 803.

It is fundamental that not all out-of-court statements are inadmissible hearsay; rather, only those offered to prove the truth or falsity of the matter contained therein are subject to the hearsay rule. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738; *People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223.) If an assertion is offered to prove that an event it describes occurred or did not occur, it is hearsay; conversely, if offered only for the *fact* that the declarant said those particular words, it clearly is admissible. (*Carpenter*, 28 Ill. 2d at 121; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.1, at 562-63, 570-71 (5th ed. 1990).) As stated in Cleary & Graham, if the statement is relevant "because the content of the statement itself tends to establish a fact of consequence when shown by independent evidence to be false, the statement is not hearsay." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.1, at 571 (5th ed. 1990).

In Buffman's case, the proof of loss statement was not hearsay because it was not offered to prove the truth or falsity of the events it depicted. It was not offered to show that Kapleton was or was not driving a Volvo for pleasure when an accident occurred. Rather, the statement's significance derived from the fact that Buffman had executed it and submitted it to Country Companies. In conjunction with the evidence of the scheme, its participants, and the type of vehicles involved, the statement served to link Buffman to the crime. Thus, its admission was proper.

Buffman also contends that the statement was inadmissible because, according to her testimony, the portions naming "Sam Kapleton" as the driver for "pleasure" were not completed at the time she signed the form. However, we find that this contention goes to the weight and credibility of the statement rather than its admissibility. (See *People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.) There is no dispute that Buffman's signature was on the form and that other material portions of it were complete when she signed it.

Furthermore, Bauer testified that such statements, which operated to release the company from liability for the claim, were usually completed before a claimant would execute them, and that the form was probably completed in this case. Bauer further established that issuance of the settlement check was contingent upon a signed proof of loss statement. The trial court either could have disbelieved Buffman's account or considered the statement without the allegedly missing portions. In any case, the statement was properly admitted.

■All three defendants next raise challenges regarding the sufficiency of the evidence. Buffman argues that the State failed to prove her guilty of either conspiracy or insurance fraud.

When reviewing a claim based upon sufficiency of the evidence, the proper inquiry for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Furthermore, it is not this court's function to retry defendant; any discrepancies in the witness' testimony or conflicts in the evidence are reserved for resolution by the trial court.

Fraud on an insurance company requires proof that the accused obtained or caused to be obtained a sum of money by making false or fraudulent representations of loss to an insurer. (Ill. Rev. Stat. 1985, ch. 73, par. 1101.) To prove conspiracy, the State must show an agreement between two or more individuals to commit an illicit act; the intent by these individuals that the act actually be committed; and the commission of an act in furtherance of the agreement by at least one conspirator. (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a); *People v. Collins* (1979), 70 Ill. App. 3d 413, 427, 387 N.E.2d 995.) Direct evidence of conspiracy is unnecessary; the facts need merely permit an inference of a " 'common design on the part of the accused and others to act in pursuance of a common criminal purpose.' " (*Collins*, 70 Ill. App. 3d at 427, quoting *People v. Brinn* (1965), 32 Ill. 2d 232, 244-45, 204 N.E.2d 724.) Additionally, because of the clandestine nature of conspiracy, courts have allowed broad inferences to be drawn from circumstances, statements, and conduct of the parties. *People v. Melgoza* (1992), 231 Ill. App. 3d 510, 523, 595 N.E.2d 1261; *People v. Roppo* (1992), 234 Ill. App. 3d 116, 125, 599 N.E.2d 974.

At trial, Buffman maintained that she merely left her car for a friend to use while she was on vacation, and upon her return, found the car damaged. She now argues that the State failed to show that she knew of or intended to take part in any alleged insurance fraud scheme.

We find that the evidence clearly showed that Buffman knowingly and intentionally participated in the plan to deceptively obtain funds from Country Companies. (See Ill. Rev. Stat. 1985, ch. 38, par. 16—1(b).) It is undisputed that Buffman procured insurance for her car in June of 1987 and that, less than one month later, she submitted a claim on the policy which proved to be based upon a fake accident. Brooks testified that when he spoke with Buffman regarding the proposed scheme, she stated that she had problems with her Volvo and wanted a new car. Brooks then informed her regarding the details of the plan, and in furtherance of it, she accompanied him to Country Companies, where he paid for her policy. This evidence was sufficient to sustain her conviction for conspiracy, even assuming she took no further role in the staged accident. (See *People v. Harmison* (1985), 108 Ill. 2d 197, 203, 483 N.E.2d 508.) Furthermore, through the acts of her co-conspirators in obtaining settlement proceeds under fraudulent pretenses, Buffman was also properly found guilty of insurance fraud. See *People v. Vettese* (1978), 61 Ill. App. 3d 279, 282, 377 N.E.2d 1168.

■ Buffman maintains, however, that Brooks' testimony should be disregarded because it was internally contradictory, impeached by Brown, and found "not credible" by the court. It is well settled that the testimony of a single witness, even if contradicted, is sufficient to sustain a conviction. (*Collins*, 106 Ill. 2d at 261-62; *People v. Loferski* (1992), 235 Ill. App. 3d 675, 682, 601 N.E.2d 1135.) We conclude that the material portions of Brooks' testimony as to Buffman's participation were consistent and sufficient to sustain her conviction. Contrary to Buffman's assertions, the trial judge did not "reject" Brooks' testimony merely because he indicated that it was subject to contention. Moreover, under the circumstances of this case, the trial court did not err in adopting Brooks' testimony over Buffman's account of events.

■ Murphy and Colar contend that the evidence did not sustain the charges of conspiracy and insurance fraud as pleaded in the indictments. They make no direct challenge to the indictments themselves.

The indictment charged these defendants and numerous others with conspiracy against Country Companies "in that they, with the intent to commit the offense of Theft of property in excess of Three Hundred Dollars *** agreed by and between themselves and others to the commission of said offense, and did, as an act in the furtherance of said agreement, *among others*, the following." (Emphasis added.) The indictment then specified over 20 acts done in furtherance of the plan and attributed to Murphy and Colar the renting of vehicles on

or about July 19, 1987, in exchange for $300. Defendants argue that, while the proof showed that they later agreed to give their insurance cards for use in the scam, there was no evidence that they were aware of the plan at the time they rented the cars; thus, they were not proven guilty as charged in the indictment.

An indictment for conspiracy must allege an agreement by the defendants to perform an illegal act and an act in furtherance of the agreement by one of the defendants. (Ill. Rev. Stat. 1989, ch. 38, par. 8—2(a); *Vettese*, 61 Ill. App. 3d at 282.) It need not allege all the elements of the substantive offense which is the object of the conspiracy. (*People v. Williams* (1972), 52 Ill. 2d 455, 460, 288 N.E.2d 406.) Furthermore, because the gist of conspiracy is the agreement to commit a crime, it is unnecessary to allege the means by which the act of conspiracy was to be accomplished. (*People v. Peppas* (1962), 24 Ill. 2d 483, 182 N.E.2d 228; *People v. DeStefano* (1967), 85 Ill. App. 2d 274, 278-79, 229 N.E.2d 325.) A conspiracy indictment must be sufficient to inform the accused of the nature of the charge against him so that he may prepare a defense, and to serve as a bar to future prosecutions for the same offense. *People v. Jayne* (1977), 52 Ill. App. 3d 990, 1004, 368 N.E.2d 422; see also *People v. Lutz* (1978), 73 Ill. 2d 204, 383 N.E.2d 171.

At the outset, we note that the indictments in this case were sufficient to apprise defendants of the charges against them. In multiple-count indictments, all counts should be read as a whole, and elements missing from one count may be supplied by another count. (*People v. Morris* (1990), 135 Ill. 2d 540, 544, 554 N.E.2d 150.) The 12-count indictment against defendants contained all of the elements of conspiracy as well as insurance fraud. It also detailed the dates of the alleged crimes; that the crimes were perpetrated against Allstate and Country Companies; and that they were carried out with rental cars and involved staged accidents and false injuries and medical claims.

Assuming, *arguendo*, that the evidence failed to show that Murphy and Colar were aware of the conspiracy at the time they rented the cars, their convictions were proper, because they clearly agreed several days later to participate in exchange for a percentage of the settlement proceeds. The fact that defendants claimed that they personally received no settlement money is of no avail; it is undisputed that their co-conspirators did fraudulently obtain insurance proceeds. Conspirators need not have entered the conspiracy at the same time or have taken part in all its actions to be criminally accountable for acts in furtherance of the conspiracy. (*Harmison*, 108 Ill. 2d at 203; *Vettese*, 61 Ill. App. 3d at 282.) Thus, the evidence was

sufficient to sustain their convictions. Although there was some variance between the proof at trial and the specific allegations against Murphy and Colar, the complained-of language was unnecessary for a valid indictment and was mere surplusage. (*DeStefano*, 85 Ill. App. 2d at 281.) Accordingly, there was no error.

■ We agree, however, that defendants' convictions for insurance fraud against Allstate must be reversed because the evidence failed to link them to the claim filed against that company. Although the evidence established that they knowingly entered the Country Companies scheme and submitted false medical documents, the only evidence linking them to the Allstate claim was testimony that the Cadillac rented by Colar was used in that staged accident. There was no proof, however, that Colar knew of the phoney Allstate claim either before or after she rented the car or that any documents were submitted in her name for that accident. The evidence merely showed that she rented a car in exchange for $300 and that, on Brown's and Brooks' instruction, she reported the car stolen. This is insufficient to support a conviction for conspiracy to commit theft or for insurance fraud against Allstate. Accordingly, Murphy's and Colar's convictions on this count of insurance fraud must be reversed.

However, there is no need to remand this case for resentencing. Defendants each were sentenced to a total of one year's probation plus community service, which was the minimum they could have received for one conviction for insurance fraud, a Class 4 felony. (See Ill. Rev. Stat. 1985, ch. 73, par. 1101; Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(7).) Thus, because defendants now stand convicted of conspiracy and two counts of insurance fraud, their sentences could not properly be reduced.

Affirmed in part and reversed in part.

JOHNSON and THEIS, JJ., concur.