139 F.3d 901
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Francisco GOMEZ, Petitioner-Appellant,
v.
George DETELLA, Warden, Stateville Correctional Center,
*** Respondent-Appellee.
 No. 94-3873.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 9, 1996--Decided Feb. 3, 1997*.
Submitted Dec. 1, 1997**.
Decided Feb. 6, 1998.
 
 On remand from the United States Supreme Court. District Court No. 94 C 2161 James F. Holderman, Judge.
 Before Hon. JOHN L. COFFEY, Hon. MICHAEL S. KANNE, Hon. ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 The Supreme Court vacated our earlier judgment in Gomez v. Acevedo, 106 F.3d 192 (7th Cir.1996), for reconsideration in light of its recent opinion in Lindh v. Murphy,--U.S.--, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). In Lindh, the Supreme Court held that the more deferential standard of review for habeas corpus petitions prescribed by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d) ("AEDPA") does not apply to cases, such as Gomez's, that were pending at the time Congress enacted that statute. Because we relied on the AEDPA when we decided this case before, we must now revisit the case and apply the familiar standard of Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original).
 
 
 2
 Gomez originally raised several issues in his habeas corpus petition. The only one surviving to this appeal is whether the evidence at his trial was sufficient to convict him without violating the Due Process Clause. We set out the facts in our previous opinion, and we assume familiarity with them. Based on those facts and the evidence the prosecution presented, we affirm the district court's decision to deny the writ of habeas corpus.
 
 
 3
 The Illinois court convicted Gomez of unlawful delivery of a controlled substance. The prosecution used an aiding and abetting theory, called accountability in Illinois:
 
 
 4
 A person is legally accountable for the conduct of another when: ... (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.
 
 
 5
 720 ILCS 5/5-2. Our Jackson inquiry, then, is whether any rational trier of fact could have found beyond a reasonable doubt that (1) Gomez "solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the delivery"; (2) Gomez's "participation took place before or during the commission of the delivery"; and (3) Gomez "had the concurrent, specific intent to promote or facilitate the commission of the offense." People v. Roppo, 234 Ill.App.3d 116, 174 Ill.Dec. 890, 599 N.E.2d 974, 981 (Ill.App.1992). Accountability does not require active participation. See People v.. Reid, 136 Ill.2d 27, 143 Ill.Dec. 239, 554 N.E.2d 174 (Ill.1990). Illinois law permits an inference that one who was present at a crime without opposing it or disapproving of it shared the criminal intent of the principal. See People v. Taylor, 164 Ill.2d 131, 207 Ill.Dec. 1, 646 N.E.2d 567 (Ill.1995).
 
 
 6
 The prosecution presented sufficient evidence for the trier of fact to find these elements. Testimony from DEA agents included the following: The principal, Martinez, told DEA agents he was phoning his "friend" who would bring the cocaine in about twenty minutes. Martinez never identified his friend by name, but after twenty minutes elapsed, Gomez arrived at the hotel and went to the DEA agent's room. Instead of consummating the deal, Martinez and Gomez left the hotel and drove away in Martinez's car. Martinez called the DEA agent and said he would be bringing the cocaine in twenty minutes. A short while later, Martinez and Gomez arrived back at the hotel parking lot. Martinez lifted the hood while Gomez stood by on the sidewalk. The two entered the hotel. Gomez waited in the lobby while Martinez went up to the DEA agent's room and delivered a kilogram of cocaine.
 
 
 7
 The state court specifically found the state's witnesses--the undercover narcotics agents--to be credible while declining to believe Gomez's testimony that Martinez told him they were going to collect money from a debtor of Martinez's so Martinez could repay a debt to Gomez. Additionally, the state court inferred from the fact that Gomez arrived after Martinez called him that Martinez identified Gomez as his source for cocaine when he said his "friend" would be making the delivery shortly. That inference alone supports the three elements of accountability listed above. Furthermore, Gomez left the hotel with Martinez and returned there with him when Martinez actually made the delivery. Gomez's continued cooperation with Martinez also supports the three elements of accountability, particularly participation before the crime and specific intent to assist in the commission of the crime.
 
 
 8
 Gomez relies on Roppo, a factually similar case, for its finding that the prosecution did not present enough evidence to prove accountability. First we note that we owe no deference to the Illinois court's interpretation of the Jackson standard. By filing a petition for a writ of habeas corpus, Gomez has raised a claim under the federal Constitution, and Illinois' interpretation of the federal Due Process Clause does not bind us. However, we will examine Roppo for its discussion of the kind of evidence Illinois requires for proof of accountability and for its possibly persuasive interpretation of the Jackson standard.
 
 
 9
 In Roppo, an undercover agent agreed to purchase cocaine from defendant Karas. After a series of contacts and transactions, Karas agreed to meet the agent in a parking lot. See Roppo, 174 Ill.Dec. 890, 599 N.E.2d at 977. Karas said his "connect" and his "connect's connect" would be waiting nearby, and he had to deliver the money to the "connect" and "connect's connect" before he could give the agent the drugs. Id. Karas drove away in his car to another parking lot where Roppo and another were sitting in a car. See id. at 978. Karas conversed with Roppo for about ten minutes. Roppo passed some object to Karas, and Karas left. Karas delivered an ounce of cocaine to the agent. See id.
 
 
 10
 Roppo was immediately arrested. Police searched his car but found no drugs. See id. Karas had never mentioned Roppo's name to the agents. The most damning evidence was that Karas had said his "connect's connect" would be waiting nearby, and that Roppo passed some object to Karas. The Appellate Court of Illinois held this evidence insufficient to convict Roppo for accountability. In particular, the appellate court was concerned that "Roppo was not present, nor was his name mentioned at" the transactions between Karas and the agent. Id. at 982.
 
 
 11
 Gomez relies heavily on the fact that, like in Roppo, Martinez never identified him by name to the undercover agents. However, unlike in Roppo, Martinez identified Gomez with sufficient particularity that the court was justified in inferring that Gomez was indeed the person Martinez expected to delivery the cocaine. That is, Martinez, gave a specific time at which his unnamed friend would deliver the cocaine, and Gomez indeed appeared at the DEA agent's hotel room at the appointed hour. Gomez continued to accompany Martinez throughout their comings and goings, and undercover agents did not see anyone else accompany Martinez. Gomez was sufficiently identified.
 
 
 12
 Gomez also argues that, like in Roppo, he was not physically present for the actual transfer of the drugs to the agent; rather, he was waiting in the hotel lobby while Martinez made the transfer in the agent's hotel room. Again, however, Gomez extends Roppo too far. In that case, defendant Roppo was never at the scene of the transfer of drugs to the undercover agent. Gomez, on the other hand, accompanied Martinez throughout the evening, making a trip in Martinez's car from and back to the hotel, after which Martinez made the transfer. Gomez was with Martinez just until the moment when Martinez handed the cocaine to the agent. The evidence of Gomez's participation was not so sparse as in Roppo.
 
 
 13
 Being unpersuaded by Gomez's arguments, we find that a rational trier of fact could have found the elements of accountability beyond a reasonable doubt, and the denial of a writ of habeas corpus is AFFIRMED.
 
 ROVNER, Circuit J., dissenting.[1]
 
 14
 Franciso Gomez stands convicted of delivering a controlled substance on a record devoid of evidence that would permit a reasonable factfinder to conclude beyond a reasonable doubt that he even knew Arturo Martinez planned to sell cocaine to Special Agent Brotan, let alone that he intended to help Martinez make that sale. There is no evidence that Gomez procured the cocaine, no evidence that he brought the cocaine to the Hillside Holiday Inn, no evidence that he discussed the cocaine with Martinez, no evidence that he was present when Martinez and Brotan discussed the transaction, no fingerprint or other forensic evidence tying Gomez to the cocaine, no evidence, in fact, that Gomez ever saw the cocaine.
 
 
 15
 Like the Illinois courts, my brothers in the majority highlight Martinez's statement to Brotan that his "friend" would be delivering the cocaine shortly to the hotel as proof that Gomez was indeed Martinez's accomplice in this transaction. Ante at 2; see Petitioner's Appendix ("App.") 28. Martinez never identified Gomez as his accomplice, of course, but we are asked to infer from Gomez's timely arrival (App.29) that he was indeed the "friend" that Martinez had promised would be bringing the cocaine in twenty minutes. Well and good, except for one thing: so far as the record reveals, Gomez arrived entirely empty-handed. Only after Martinez and Gomez left the hotel and returned an hour later from parts unknown did the cocaine finally surface--in Martinez's hands, as he turned it over to the agent. App. 32-33. Gomez, meanwhile, was waiting in the hotel lobby; and the surveillance agents had never seen him hand anything to Martinez. App. 13, 20-21, 33-34, 48, 71. Contrast People v. Melgoza, 231 Ill.App.3d 510, 172 Ill.Dec. 591, 595 N.E.2d 1261, 1282 (Ill.App.1992) (after accomplice promised undercover officer that his "guy" or his "connect" would be arriving shortly, defendant arrived, accomplice removed a record album from defendant's car and delivered the album to the officer, who discovered cocaine inside album cover).
 
 
 16
 Now it is possible, I suppose, that Gomez had in fact delivered the cocaine to Martinez earlier that evening. Again there is a problem: Gomez had arrived that August night on a motorcycle, wearing only pants and a shirt (probably a t-shirt), and at no time that evening was he observed to be carrying anything, nor, as I have noted, handing anything to Martinez. App. 53, 62-66, 71, 83-84. Still, I am no Houdini; maybe Gomez was skilled at hiding kilogram-sized bricks of cocaine on his person beneath lightweight summer apparel. See App. 32-33, 48-50 (describing the cocaine).
 
 
 17
 It is no less likely, however, that it was Martinez himself who obtained the cocaine. Consider that when Gomez and Martinez returned to the hotel after driving around for an hour in Martinez's car, they exited the Camaro, walked around the lot for a moment, and then Martinez returned to the car alone, moved it to a different parking space, got out, lifted the hood up, and then closed the hood, while Gomez stood by on the sidewalk. App. 55-56, 65-71. We do not know what, if anything, Martinez may have retrieved from the engine compartment (see App. 69), but this is the only evidence in the record that even comes close to placing the brick of cocaine in the hands of either Martinez or Gomez at any time prior to the delivery to Brotan moments later (see App. 32-33, 48-50). Again the cocaine (if that is what was retrieved from underneath the hood) was in Martinez's hands, not Gomez's. And again the surveillance officer could not establish that Gomez even saw what Martinez was doing underneath the hood of the car. See App. 70 (Officer Mugford: "When the hood opened, I could not see either one of them ...."), id. at 71 ("As I said, when the hood was raised up they were there and then I could not see either one of them.").
 
 
 18
 The fact is, we know nothing about what occurred in the hour that Martinez and Gomez were driving around and Brotan was waiting in his hotel room for the delivery; nothing, that is, except for Martinez's telephone call from the road telling Brotan that he would be returning with the cocaine a short time later. App. 31-32 (Agent Brotan: "And [Martinez] told me that he would be there in 20 minutes and that he had the cocaine and that he was going to bring it up himself and he would be alone."). Gomez could have procured the cocaine while he and Martinez were driving around; he may have even had the cocaine with him when he first arrived at the hotel on his motorcycle. But this is sheer speculation. The facts as we know them do not reasonably permit the inference that Gomez was either the source or the courier of the cocaine. See People v. Darnell, 214 Ill.App.3d 345, 158 Ill.Dec. 67, 573 N.E.2d 1252, 1265 (Ill.App.1990).
 
 
 19
 We are left with Gomez's presence at the scene of the offense. Illinois courts recognize that a defendant's mere presence at the scene, even coupled with his awareness that a crime is in progress, is not enough to establish his guilt under an accountability theory. E.g., People v. Batchelor, 171 Ill.2d 367, 216 Ill.Dec. 519, 665 N.E.2d 777, 780 (Ill.1996); People v. Taylor, 164 Ill.2d 131, 207 Ill.Dec. 1, 646 N.E.2d 567, 571 (Ill.1995). On the other hand, a defendant's "approving presence," and conduct on his part evidencing a design to facilitate the offense, will support a finding of accountability. E.g., People v. Martinez, 278 Ill.App.3d 218, 214 Ill.Dec. 907, 662 N.E.2d 473, 476 (Ill.App.1996); People v. Dukes, 263 Ill.App.3d 765, 200 Ill.Dec. 393, 635 N.E.2d 732, 736 (Ill.App.1994); People v. Roppo, 234 Ill.App.3d 116, 174 Ill.Dec. 890, 599 N.E.2d 974, 981 (Ill.App.1992). But there is no evidence in this record indicating that Gomez approved of the transaction, let alone that he took steps to aid it. The very most one can say is that he was present; and concededly, with his own account of his reason for being there having been explicitly discredited by the trial judge (App.99), his presence is suspicious. But that is all. In the absence of evidence confirming that Gomez knew what this transaction was all about--that he saw the cocaine, for example, or that he talked about the sale with Martinez (see App. 45)--it is impossible to describe his presence as approving or facilitating. Illinois courts have made that point repeatedly. Compare Roppo, 174 Ill.Dec. 890, 599 N.E.2d at 982; Darnell, 158 Ill.Dec. 67, 573 N.E.2d at 1264-67; People v. Deatherage, 122 Ill.App.3d 620, 78 Ill.Dec. 47, 461 N.E.2d 631, 634 (Ill.App.1984), with Martinez, 214 Ill.Dec. 907, 662 N.E.2d at 476 ("the record here reflects a concatenation of events which demonstrate a clear understanding on the part of each of the actors of what his or her role was ...."); People v. Testa, 261 Ill.App.3d 1025, 199 Ill.Dec. 370, 633 N.E.2d 1361, 1365 (Ill.App.1994) ("in this case the defendant was not only present in [the co-conspirator's] motel room but he retrieved the cocaine from its hiding place, handed it to the police officer, and pocketed the money"); People v. Tinoco, 185 Ill.App.3d 816, 133 Ill.Dec. 760, 541 N.E.2d 1198, 1203 (Ill.App.1989) ("[t]he record evidence here demonstrates that defendant's position transcended that of a mere observer": defendant was present during multiple narcotics sales, defendant made assurances to undercover officer as to drug quality and quantity; and codefendant handed thousands of dollars in purchase money to defendant). I recognize that these cases do not control our assessment of the sufficiency of the evidence (ante at 3), but they exemplify the need for at least some evidence that the defendant was at least aware of the nature of the illicit transaction before his presence may be deemed "approving." The record before us is utterly lacking in such evidence.
 
 
 20
 As my colleagues observe (ante at 2), the trial judge found Gomez's testimony incredible and credited instead the prosecution's witnesses. App. 99. I must point out, however, that this was not a swearing contest in the usual sense. None of the state's witnesses had personal knowledge of Gomez's complicity in Martinez's cocaine trafficking; none of them could or did testify that yes, it was Gomez who supplied the cocaine that Martinez handed to the agent. The state's witnesses could only report what they heard and saw on the evening in question, and for the reasons I have discussed, what they observed is not enough to establish Gomez's accountability beyond a reasonable doubt. Gomez's own lack of credibility cannot fill in the holes in the state's case. Cf. United States v. Sanchez, 928 F.2d 1450, 1457-58 (6th Cir.1991) ("any argument relating to [the] credibility of the government's witnesses is irrelevant to our determination of the sufficiency of the evidence").
 
 
 21
 Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979), commands deference to state factfinders and the reasonable assessments they make of a defendant's culpability. But the constitution also demands that we pay close attention to the line between evidence that merely makes it likely that the defendant is guilty and evidence that reasonably proves the defendant's guilt beyond a reasonable doubt. See id. at 320, 99 S.Ct. at 2789-90; In re Winship, 397 U.S. 358, 367-68, 90 S.Ct. 1068, 1074, 25 L.Ed.2d 368 (1970). Otherwise we risk depriving the presumption of innocence of its vitality. See id. at 363, 90 S.Ct. at 1072; Jackson, 443 U.S. at 323-24, 99 S.Ct. at 2791. Careful scrutiny of this record reveals that there is simply not enough evidence to support Gomez's conviction. Due process therefore requires that we intervene and relieve him of the eighteen-year sentence he is serving. Winship, 397 U.S. at 364, 90 S.Ct. at 1073.
 
 
 22
 I respectfully dissent.
 
 
 
 **
 * George DeTella, the warden at the facility where Gomez is now incarcerated, is substituted for Gerardo Acevedo, the warden where Gomez was formerly incarcerated, as defendant
 
 
 *
 Gomez v. Acevedo, 106 F.3d 192 (7th Cir.1997)
 
 
 **
 After an examination of the original briefs filed in this case and the record, we have concluded that oral argument and rebriefing are unnecessary; accordingly, the appeal is considered on the existing pleadings and the record. See Fed. R.App. P. 34(a); Cir. R. 34(f)
 
 
 [1]
 I joined the panel's first opinion in this case because I was persuaded that the habeas corpus statute, as amended by the "Antiterrorism and Effective Death Penalty Act of 1996," Pub.L. 104-132, 110 Stat. 1214, commanded deference to the state courts' application of the sufficiency-of-the-evidence standard articulated by Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See 28 U.S.C. § 2254(d); Gomez v. Acevedo, 106 F.3d 192, 198-200 (7th Cir.), cert. granted, vacated, and remanded, --- U.S. ----, 118 S.Ct. 37, 139 L.Ed.2d 6(1997). Without the layer of deference added by the AEDPA, I do not believe that Gomez's conviction can survive scrutiny under the Jackson standard