NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190538-U

NO. 4-19-0538

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 10, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JULIUS O. SCOTT, | ) | No. 18CF692 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the trial court did not err in
excluding defense witness testimony and (2) the prosecutor did not improperly
bolster the victim's credibility during trial.

¶ 2    Following a May 2019 trial, a jury found defendant, Julius O. Scott, guilty of two

counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)).  The jury

acquitted defendant on two counts of criminal sexual assault (720 ILCS 5/11-1.20 (a)(1) (West

2016)).  In July 2019, the trial court sentenced defendant to four years' imprisonment on both

counts of aggravated criminal sexual abuse, to be served concurrently.

¶ 3    Defendant appeals, arguing he was denied a fair trial where (1) the trial court

excluded critical testimony from a defense witness that corroborated his defense that he

reasonably believed the alleged victim was 17 years old at the time they had intercourse and

(2) the prosecutor improperly bolstered the credibility of the alleged victim by (a) personally

vouching for the alleged victim's testimony during closing arguments, (b) arguing the alleged victim made prior consistent statements based on evidence outside of the record, and (c) using *voir dire* to predispose the jurors into accepting the alleged victim's testimony. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5            On July 18, 2018, the State charged defendant with (1) criminal sexual assault (the penis of defendant and the vagina of the victim) (720 ILCS 5/11-1.20 (a)(1) (West 2016)) (count I), (2) criminal sexual assault (the mouth of defendant and the vagina of the victim) (720 ILCS 5/11-1.20 (a)(1) (West 2016)) (count II), and (3) criminal sexual assault while being in a position of trust (the penis of defendant and the vagina of the victim) (720 ILCS 5/11-1.20 (a)(4) (West 2016)) (count III), and (4) criminal sexual assault while being in a position of trust (the mouth of defendant and the vagina of the victim) (720 ILCS 5/11-1.20 (a)(4) (West 2016)) (count IV), (5) aggravated criminal sexual abuse where the victim was at least 13 years old but under 17 years old and defendant was at least five years older than the victim (the penis of defendant and the vagina of the victim) (720 ILCS 5/11-1.60 (d) (West 2016)) (count V), and (6) aggravated criminal sexual abuse where the victim was at least 13 years of age but under 17 years of age and defendant was at least five years older than the victim (the mouth of defendant and the vagina of the victim) (720 ILCS 5/11-1.60 (d) (West 2016)) (count VI). The charges stemmed from a November 2017 incident between the victim, D.H., who was 16 years old and defendant, who was 22 years old, where defendant inserted his penis into D.H.'s vagina and performed oral sex on D.H.

¶ 6                                 A. Pretrial Motions

¶ 7            On March 29, 2019, defendant provided discovery pursuant to Illinois Supreme Court Rule 413 (eff. July 1, 1982), alleging, in relevant part, he might call "Kendell [*sic*] Martin"

as a witness at trial. During an April 5, 2019, pretrial hearing, defense counsel requested a continuance, stating,

> "About two weeks ago my client gave me the name of someone
> who had information as to the victim in this case. It's a—it's a—a
> couple of the charges are charged as unable to consent based on the
> victim being under the age of 17 years of age. Obviously, there is
> a defense that if the defendant was under a reasonable belief that
> the victim was over 17 on his part, this witness, Kendall Martin,
> has information pertaining to that.
>
> I, after getting a [tele]phone number for Mr. Martin, had an
> investigator attempt to contact him. She did make contact over
> [the] [tele]phone. He did not meet with her as she had requested.
> She has since in the last week been trying to get him served with
> an actual subpoena for next week and talk to him further but has
> been unable to do that."

The trial court granted defendant a continuance. On April 25, 2019, Kendall Martin was personally served a witness subpoena.

¶ 8        On May 3, 2019, defendant provided discovery pursuant to Illinois Supreme Court Rule 413 (eff. July 1, 1982), alleging he "intends to assert the defense that he reasonably believed the alleged victim to be 17 years of age of [*sic*] over, defendant may call any of the persons listed in the State's Discovery Compliance as a witness." On May 6, 2019, defendant provided additional discovery pursuant to Rule 413, alleging he intended to assert the defense of consent as to counts I and II.

¶ 9                                    B. Defendant's Jury Trial

¶ 10            Below, we summarize the relevant testimony elicited during defendant's May 2019 jury trial. Before the case proceeded to *voir dire*, the State moved to dismiss counts III and IV because "upon further investigation it appears that the defendant did not hold a position of trust or authority or supervision over [the] victim." The case proceeded to trial on counts I, II, V, and VI. The trial court admonished defendant on the charges against him. As to counts V and VI, the court stated, "consent is not a defense. However, an affirmative defense of that you had a reasonable belief that the alleged victim was over 17 is available as a defense."

¶ 11                                    1. *Voir Dire*

¶ 12            During *voir dire*, the prosecutor asked potential jurors about their possible responses to a mass shooting. The prosecutor stated,

> "All right, folks, this next question, I'm definitely not
> trying [to] bring up anything that makes anybody uncomfortable,
> but could you raise your hands—the folks sitting up here in this
> jury box, could you raise your hand if you remember the 2012
> mass shooting that took place in Aurora, Colorado, inside of a
> movie theater, if you remember that incident happening in the
> United States of America. ***.
>
>        ***
>
>        *** So it looks like everybody raised their hand related to
> that question. So, ladies and gentlemen, obviously unfortunately in
> society today mass shootings are a fairly frequent occurrence. And
> the reason I bring that up is my next question is could you raise

- 4 -

your hand if you've thought about what you would do personally if you were in a mass shooting situation? Could you raise your hand if you ever thought about what you would do in a mass shooting situation?"

The prosecutor then informed jurors that there were three possible victim reactions to a mass shooting: (1) confront the mass shooter, (2) flee from the mass shooter, and (3) uncertain how one would react to a mass shooter. For each possible response, the prosecutor had the jurors raise their hands to indicate how they would react to a mass shooter. The prosecutor asked the same set of questions to a second group of prospective jurors. Both parties selected prospective jurors from the two groups to serve on the jury.

¶ 13                                2. *Opening Statements*

¶ 14          During opening statements, the prosecutor reminded the jurors of their different responses to the mass shooting question during *voir dire* and asked them to remember their responses when observing D.H. testify. Specifically, the prosecutor stated,

"I want you to keep that in mind that [D.H.] at the time this happened was just sixteen years old. She may not act the way that you expect a typical sexual assault survivor to act. Going back to the Colorado shooting example when you guys were all selected through the jury selection process, each one of you had a different reaction to how exactly you would react in that situation. I want you to keep that in mind when [D.H.] is testifying in front of you. Because she was a child when this happened, she may react a little bit differently by laughing nervously. She has a tendency to smile

at awkward times. She understands the gravity of what happened to her, even though she was young at the time that it happened and she's embarrassed to talk about it. I'm confident you'll find her account of what happened to be authentic and the details to be compelling."

¶ 15                                    3. *The State's Evidence*

¶ 16                                        a. D.H.

¶ 17        D.H., the victim, testified that in the fall of 2017 she was 16 years old and lived in Bloomington, Illinois, with her grandmother. D.H. lived down the street from the Boys and Girls Club (Club) and Sunnyside Park. D.H. testified that in November 2017 she was not a member of the Club but she attended teen nights at the Club on Tuesdays and Thursdays. D.H.'s sister worked at the Club, and D.H. frequented the Club.

¶ 18        D.H. first met defendant in the summer of 2017, when she went to Sunnyside Park after seeing a group from the Club and defendant, who she guessed "was a volunteer" with the Club, playing in the park. D.H. identified defendant in court as the person she met at Sunnyside Park. D.H. testified she saw defendant at the Club frequently but she did not interact with him. D.H. spoke with defendant one time while she played with the younger kids in the gymnasium. D.H. did not recall a staff member at the Club ever speaking to her about defendant.

¶ 19        D.H. testified that in the fall of 2017 she obtained defendant's Snapchat information from her cousin. D.H. and defendant began to communicate back and forth on Snapchat. D.H. described her and defendant's communications as "Sometimes it was just hey, how you doing. But then it got to the point where he kept texting me and asking me, you know,

begging me to try to be with him." D.H. explained she took "be with him" to mean date him. D.H. told defendant she was not interested in dating him. D.H. testified she told defendant she was 16 years old and never told defendant she was 17 years old or older. Defendant told D.H. he was 23 years old. D.H. testified she sent defendant a photograph through Snapchat once.

¶ 20　　　D.H. testified that on November 16, 2017, she attended a teen night at the Club. Around 7 p.m., D.H. left teen night with her cousin, A.M. D.H. and A.M. walked to Sunnyside Park. While in the park, defendant showed up. D.H. and defendant started talking, and eventually A.M. left the park, leaving defendant and D.H. alone. D.H. testified she and defendant were just talking and walked over to a nearby tree. Once by the tree, defendant asked D.H. to be with him, but she told him no. Defendant then kissed D.H., and she kissed him back once. Defendant briefly picked D.H. up before he put her down, and they walked over to a hillside. Once over by the hill, defendant and D.H. sat down. D.H. testified she did not have a blanket with her and they sat on the grass. Defendant then got on top of D.H. and kissed her. D.H. tried, unsuccessfully, to push defendant off her.

¶ 21　　　Defendant pulled D.H.'s pants and underwear off and performed oral sex on D.H. where defendant licked her vagina for "one to two licks." D.H. testified that she repeatedly told defendant no. Defendant then pulled his penis out of his pants and placed his penis in D.H.'s vagina. D.H. testified defendant's penis was inside of her vagina for "one or two strokes so about ten seconds." D.H. told defendant no and eventually pushed him off her. D.H. then walked home crying. When D.H. got home, she showered and found blood in her underwear. D.H. testified defendant called her the next day but she told him to "stop calling me, just leave me alone." D.H. had no further communication with defendant and never saw him again.

¶ 22    D.H. testified she told A.M. about the incident with defendant a few weeks after it happened. D.H. testified she told her parents and grandmother about the incident with defendant after they confronted her about her failing grades. Eventually, D.H. spoke with Detective Curt Maas at the Child Advocacy Center (CAC) about the incident with defendant. D.H. viewed a photo lineup and identified defendant as the person involved in the incident in the park.

¶ 23    On cross-examination, D.H. denied talking to her friends about defendant after meeting him. D.H. testified A.M. knew how she felt about defendant and her desire to not be left alone with him in the park on November 16, 2017. D.H. reiterated she only talked to defendant in person one time before the intercourse in the park. When asked if she brought a blanket to Sunnyside Park on October 30, 2017, and engaged in intercourse with defendant, D.H. stated she did not remember. D.H. also testified she did not remember meeting with defendant at Sarah Raymond Elementary School on November 3, 2017. When confronted with a photograph she sent defendant through Snapchat on November 15, 2017, D.H. admitted she sent the photograph to defendant but explained the emoticon on the photograph did not mean anything. D.H. testified she and defendant "never had a conversation about him not finding out I was eighteen." D.H. stated defendant knew she was not 18.

¶ 24    D.H. testified she did not recall telling Detective Maas that on the night of November 16, 2017, defendant carried her all the way up the hill, threw her down on the ground, and did not remove her underwear but pushed her panties to the side. D.H. testified defendant did not take her underwear or pants completely off during the intercourse.

¶ 25    On redirect examination and recross-examination, D.H. testified that prior to the intercourse in the park on November 16, 2017, she called defendant on the telephone using a

- 8 -

private telephone number and defendant gave her his telephone number but she did not give him her telephone number.

¶ 26                                    b.  Schanda Butcher

¶ 27        Schanda Butcher, former director at the Club from 2014 to 2018, testified she knew D.H. through her attendance and regular involvement at the Club.  Butcher testified defendant began volunteering at the Club to complete community service requirements and his duties were "to work with our K through five youth and any cleaning that we had to do after our meals or at the end of the day, kind of to support program K through five as far as like behavior and stuff like that."

¶ 28        Butcher recalled one occasion where she observed D.H. and defendant speaking at the Club.  While defendant and D.H. were speaking in the gymnasium, Butcher observed D.H. blushing.  Butcher later spoke with defendant about the interaction, and defendant told Butcher "it was nothing."  Following her conversation with defendant, he left the Club "then came back within like the hour."  Butcher testified D.H. was a member of the Club and she "participated in teen club and stuff like that."

¶ 29                                    c.  A.M.

¶ 30        A.M. testified she was 15 years old and D.H. was "kind of like my cousin."  In 2017, A.M. and D.H. spent a lot of time together, and they both regularly attended teen night at the Club.  In November 2017, after a teen night, A.M. and D.H. walked home and cut through Sunnyside Park.  Once in the park, defendant showed up and spoke with both girls.  Eventually, A.M. left the park alone to catch a ride home, but defendant and D.H. remained at the park.  A.M. testified she was not concerned about leaving D.H. with defendant in the park.

¶ 31        A.M. described defendant and D.H.'s relationship as "friends."  A.M. testified that a few weeks after the night in the park, she spent the night at D.H.'s house and asked D.H. what happened in the park.  D.H. told A.M. she did not want to talk about it and "was sad and crying."  A.M. testified D.H. "was acting different.  She wasn't acting like herself."  Eventually, D.H. told A.M. about the incident between her and defendant in the park.

¶ 32        A.M. also testified that in November 2017, she asked defendant his age and he told her he was 18 years old.  After the incident with defendant and D.H. in the park, A.M. found out defendant was not 18 years old.  A.M. and D.H. originally met defendant at a teen night at the Club while he volunteered.  A.M. testified in order to be a volunteer at the Club you had to be at least 18 years old.

¶ 33        A.M. testified D.H. talked about defendant a lot, she thought he was cute, and she kind of liked him.  A.M. knew defendant and D.H. communicated via Snapchat.  D.H. never shared any of their conversations with A.M., but A.M. knew D.H. sent defendant pictures via Snapchat.  A.M. testified D.H. and defendant talked for purposes of "trying to see if they were going to date."

¶ 34                                d.  Detective Curt Maas

¶ 35        Curt Maas, a detective with the Bloomington Police Department, testified that in May 2018 he interviewed D.H. at the CAC.  D.H. told Detective Maas about the incident in the park with defendant.  Detective Maas testified that D.H. told him defendant picked her up, laid her down on a hillside, and her underwear stayed on during the sexual assault where defendant moved her underwear to the side when he penetrated her.

¶ 36        In July 2018, Detective Maas interviewed defendant at the Bloomington Police Department about the incident in the park with D.H.  Detective Maas testified defendant denied

having intercourse with D.H. in November 2017 but later claimed he had sex with D.H. plenty of times before maintaining he only had intercourse with D.H. once. Detective Maas also testified defendant originally told him D.H. was 16 or 17 years of age at the time of the incident. The State played a video recording of defendant's police interview for the jury.

¶ 37                                e. Anticipated Witness

¶ 38       Following Detective Maas's testimony, the State rested its case-in-chief outside the presence of the jury. The State then made the trial court aware there was an issue with one of defendant's anticipated witnesses, Kendall Martin, due to his testimony being outside the scope of the disclosure originally given to the State. Specifically, the State alleged Martin would testify about a conversation he overheard between defendant and D.H. where D.H. denied her real age and told defendant she was older than she was.

¶ 39       Defense counsel explained the nature of the conversation. Specifically, sometime in November 2017 while at the Club, defendant showed some guys he played basketball with a picture D.H. sent him of herself. It then came up that D.H. was only 16 years old. After defendant and Martin finished playing basketball, Martin witnessed defendant confront D.H. at the Club about her age, and D.H. told defendant she was 18 years old. The State argued Martin's testimony about what D.H. said about her age was hearsay because D.H. was not confronted with the statement.

¶ 40       The trial court found Martin's anticipated testimony about the conversation he allegedly heard between defendant and D.H. constituted hearsay. Specifically, the court indicated:

> "[Martin's anticipated testimony about the conversation] would be
> a matter that the [S]tate would be prejudiced by by not being able

to—excuse me, having closed its case in chief and not having addressed the issue. Also, it's irrelevant as I will get to in just a minute here as to what impact it had upon Mr. Martin as far as the effect on that statement being allegedly made by the victim.

As it relates to the defendant, however, the analysis is different. If the defendant testifies that that statement was made by the alleged victim in this case, it is not being offered to prove the truth of the matter asserted. It would be admissible on a limited basis to show it's [*sic*] effect on the listener, that being the defendant, and why it is that he acted in the manner that he ultimately did. Credibility cuts both ways, basically, as far as the alleged victim and the defendant, and it's up to the jury to determine who to believe as far as what statements were made and whether or not they were true. So, no as to Martin; yes as to the defendant."

The court clarified Martin could testify, but he could not testify about the conversation he overheard and if defendant testified about the conversation, the State could call D.H. back to the stand to refute the statements.

¶ 41        Back in the presence of the jury, the State rested its case-in-chief.

¶ 42        4. *The Defense*

¶ 43        Following the State's case-in-chief, defendant called his first witness.

¶ 44        a. Kendall Martin

¶ 45        Kendal Martin testified that in the fall of 2017, he played basketball with defendant at the Club.  One day, defendant showed Martin and other basketball players a photograph of D.H.  Martin testified that after defendant showed the photograph, some of the other guys reacted to the photograph.  Martin did not hear the conversation between the other guys because he was on the basketball court.  Martin believed defendant showed the picture to the guys sometime in December 2017.

¶ 46        Martin testified to his relationship with defendant, calling defendant a "good friend."  Martin and defendant talked "every time [they] got the chance to."  Martin stated they spoke "[m]ore than a couple of times a week."  Martin and defendant met at the Club during Martin's sophomore year in high school where Martin knew defendant to be a volunteer.

¶ 47                              b.  Defendant

¶ 48        Defendant acknowledged he was previously convicted of domestic battery on November 2, 2017.  In August 2017, defendant began volunteering at the Club to complete 95 hours of community service for a misdemeanor plea.

¶ 49        Defendant testified he met D.H. in September 2017, while volunteering at the Club.  Defendant explained he met D.H. "through another person that she referred to as her cousin."  The day defendant met D.H., she was in the gymnasium.  Defendant testified he had a "slight conversation" with D.H. in the gymnasium but "[i]t was more like a, 'Hey, how are you doing?' 'I'm doing fine.' And then kind of get to work."  Defendant continued to see D.H. at the Club with her sister, a staff member, but he did not speak with D.H.

¶ 50        Defendant and D.H. began communicating through Snapchat after D.H.'s cousin gave defendant D.H.'s Snapchat information and informed him D.H. liked him.  Defendant described his Snapchat conversations with D.H. as "simple" conversations that occurred "[e]very

day, all day, Monday through Sunday." Defendant testified that eventually his relationship with D.H. progressed and "[i]t was elaborated upon more that she liked me. I did, in fact, like her. I hadn't let it be known that I liked her, but that's how our relationship progressed." Defendant engaged in light conversations with D.H. at the Club "but usually it was just talking through Snapchat."

¶ 51　　　　Defendant testified that in October 2017, he spoke to D.H. about her age over Snapchat. Defendant asked her about her age "because I [had] seen her at the club, but I don't ever see her do anything, and I don't ever see her with teen unless she's having a conversation with them, and she's the only person that I would see that would come and go and disappear." Defendant testified D.H. "told me she was 17 getting ready to be 18 in December." D.H. sent defendant pictures of herself getting ready for school. Defendant testified D.H. told him "she would be graduating from school a semester early" and planned to study child development at Illinois State University. Defendant stated while it was known he was 18 or older because he was a volunteer at the Club and that was a requirement, he never personally told D.H. his age.

¶ 52　　　　Eventually, defendant and D.H.'s relationship progressed into a physical relationship. Defendant testified that on October 30, 2017, he met D.H. in Sunnyside Park. When he approached her in the park, D.H. was alone, and she greeted him by jumping into his arms. Defendant testified D.H. had a blanket with her, the two of them laid down on the blanket, and had sex. Defendant also performed oral sex on D.H. After the interaction, they both went their separate ways home. Defendant continued communicating with D.H. on Snapchat. Defendant met up with D.H. on November 8, 2017, at Sarah Raymond Elementary School and on November 18, 2017, at the Club. Defendant also testified D.H. met him on November 3, 2017, at Sarah Raymond Elementary School.

¶ 53    On November 15, 2017, defendant received a photograph of D.H. and saved it to his cell phone. On Saturday, November 18, 2017, defendant played basketball at the Club and showed the photograph of D.H. to a few people he played basketball with. Defendant stated, "I showed that picture because I let them know there was a girl I had been talking to recently." Defendant testified the guys he played basketball with were astonished and asked him why he was talking to someone so much younger than him. Then, one of the guys told defendant that D.H. was 15 or 16 years old.

¶ 54    The next day, defendant asked D.H. to come to the Club. Defendant testified he did not believe anyone was around when he confronted D.H. Specifically, defendant testified he was upset and confronted D.H. about her age. Defendant testified that when he confronted D.H., she told him she was 17 years old turning 18 years old. Defendant then ended the relationship. Defendant testified they stopped communicating over Snapchat but about a week and a half later, he received a private telephone call from D.H. but they did not resume a relationship.

¶ 55    In July 2018, defendant went to the Bloomington Police Department and spoke with Detective Maas. Defendant testified Detective Maas prevented him from leaving and pushed him up against a wall. Defendant admitted he initially lied to Detective Maas about the incident with D.H. after Detective Maas mistreated him when he arrived at the police station. Eventually, defendant told the truth to Detective Maas about the intercourse with D.H. At the time of the interview, defendant knew D.H.'s real age. Defendant testified that when he arrived at the police station to speak with Detective Maas, he was under the influence of marijuana.

¶ 56    On cross-examination, defendant testified that in September 2017, D.H. asked him his age and he told her he was 22 years old. Defendant denied having sex with D.H. on

November 16, 2017. Defendant reiterated the intercourse between him and D.H. occurred on October 30, 2017.

¶ 57        In rebuttal, the State called Detective Maas. Detective Maas stated defendant showed no signs of intoxication during the police interview. Detective Maas also denied he threw defendant against a wall or initially told defendant he could not leave.

¶ 58                                5. *Closing Arguments*

¶ 59        Prior to closing arguments, the trial court stated to the jury, "Just as I told you during opening statements, what the attorneys say during closing arguments is not evidence and should not be considered by you as evidence."

¶ 60        During closing arguments, the prosecutor stated, "you have [A.M.'s] testimony which I found especially compelling." In response, defense counsel called into question D.H.'s credibility and remarked D.H.'s testimony was not truthful. In rebuttal argument, the prosecutor addressed the number of inconsistencies in defendant's testimony compared to the number of inconsistencies defense counsel identified in D.H.'s testimony. Specifically, the prosecutor pointed out that, at trial, defense counsel tried to find inconsistencies in D.H.'s testimony compared with the information she provided during her interview with Detective Maas. During argument, the prosecutor stated:

> "As you can remember, when [D.H.] takes the stand and is
> being questioned by defense counsel, they were pointing out
> inaccuracies with her testimony based off of the information as
> provided to Detective Maas at the Children's Advocacy Center
> back in May of 2018. So [D.H.], obviously, had this interview
> with Detective Maas, she testifies here in court, defense counsel is

then capable attempting to impeach her, they caught inconsistencies in those statements. So the interview at the CAC took place back in May of 2018 and it is now May of 2019, and the number of inconsistencies that we saw in the testimony of [D.H.] explained that she was sexually assaulted amounted to the following.

Was she set down on the ground by the defendant after he walked her over to the grassy area or did she walk there herself and sit down? Were her underpants taken completely off of her body during the sexual assault or were her pants taken off and her underpants moved to the side during the oral sex and sexual assault during the sexual intercourse? That is the total number of inconsistencies that were presented to you by the defense of [D.H.'s] testimony related to her sexual assault from November 16 of 2017.

Two, the number of inconsistencies from the defendant in this case just related to his talking to Detective Maas to meet up to talk about the investigation amounted to approximately 10. ***.

* * *

So [D.H.'s] testimony, the inconsistencies in her story amount to literally nothing, and just that small snippet of the story of the defendant in this case, multiple inconsistencies. And then you watch his interview. You watched it; you read the transcript

yesterday.  You see him testify here today.  The number of inconsistencies, ladies and gentlemen, I apologize if I get heated and animated, it was mind blowing to hear that testimony today.  'I wasn't presented with the opportunity to give my information to Detective Maas that day.'  Yes, you were.  We saw it on screen multiple times.  'Be honest.  Tell me what's going on.'  'No opportunity.'  'It was because I was playing with him.'

Shall I continue and address all the inconsistencies?  For starters, he worked at the Boys and Girls Club for two years.  He's been there since September.  Known [D.H.] the entirety of 2017 and built up our relationship.  He met her in October or September.  That's in the first five seconds of the interview."

Further, the prosecutor stated,

"Ladies and gentlemen, I understand that defense counsel's questioning that were asked of the victim in this case, but I would make the comment that I would ask you to remember her demeanor on the stand.  She was having a difficult time testifying as to what happened to her.  I felt like she was being exceptionally truthful on the stand."

D.H.'s recorded police interview was not admitted into evidence.

¶ 61                                6. *Jury Verdict*

¶ 62          The jury found defendant guilty on both counts of aggravated criminal sexual abuse (counts V and VI).  The jury found defendant not guilty on the two counts of criminal sexual assault (counts I and II).

¶ 63                             C. Posttrial Motion

¶ 64          On June 5, 2019, defendant filed a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, a new trial.  In the motion, defendant alleged (1) the State failed to prove defendant guilty beyond a reasonable doubt, (2) the jury's findings were against the manifest weight of the evidence, and (3) the above errors individually and cumulatively deprived defendant of due process and a fair trial.

¶ 65                           D. *Krankel* Hearing

¶ 66          During a July 9, 2019, hearing, defense counsel informed the trial court that defendant wanted to file an appeal alleging ineffective assistance of trial counsel.  The trial court then explained defendant could present his issues at the current hearing or he could wait to get his thoughts together and present those issues at the next court hearing.  Defendant responded he was prepared to proceed on his ineffective assistance claim that day.

¶ 67          Defendant argued his defense counsel failed to impeach A.M. and D.H. with prior inconsistent statements they made about his age.  Defense counsel stated she did not impeach A.M. or D.H. about defendant's age based on trial strategy and "[w]hat the victim, alleged victim, believed [defendant's] age to be wasn't the question."

¶ 68          The trial court found the jury heard, even without defense counsel impeaching D.H.'s testimony, that:

> "[D.H.] said on one occasion she thought you were 17 and then on
> another occasion she thought that you told her you were 23.  So it's

not ineffective assistance of [defense counsel] not to bring that out
when the jury already heard it. It's a matter of the trier of fact, the
jury, to determine what weight to give to her testimony and which
of those statements would be more credible."

The court determined any testimony as it related to A.M. was irrelevant and defense counsel demonstrated effective assistance where it was up to counsel to decide what strategy to use during trial. Further, the court stated, "So it's not anywhere close to a claim, that lacks merit on that particular claim because it's both legally immaterial and it pertains to trial strategy and the [c]ourt so finds."

¶ 69 The trial court asked defendant if he had any other issue to address on his claim for ineffective assistance of counsel and he responded, "[t]hat's all." The court again stated that defendant's ineffective assistance of counsel claim lacked merit "because it's legally immaterial and pertains solely to an issue of trial strategy." The court also clarified that the jury never saw video footage of D.H.'s interview with Detective Maas, contrary to defendant's assertion. Then, the court continued defendant's sentencing hearing to another day.

¶ 70 E. Sentencing

¶ 71 On July 30, 2019, the trial court denied defendant's posttrial motion and held a sentencing hearing. In sentencing defendant, the court stated:

"All right. For purposes of sentencing the court has
considered the evidence at trial, the gravity of the offenses, the
presentence investigation report as amended, the financial impact
of incarceration, the victim's impact statement. The group exhibit,
defendant's group exhibit which contains character reference

letters for the defendant. The court having also considered all

statutory matters in aggravation and mitigation, the history and

character and attitude of the defendant, his age, as well as his

potential for rehabilitation. The court having considered all

sentencing options, having further considered the

recommendations and arguments of the counsel along with the

defendant's statement in allocution."

Ultimately, the court sentenced defendant to four years' imprisonment on both counts of

aggravated criminal sexual abuse, to be served concurrently.

¶ 72        This appeal followed.

¶ 73                          II. ANALYSIS

¶ 74        On appeal, defendant argues he was denied a fair trial where (1) the trial court

excluded critical testimony from a defense witness that corroborated his defense asserting he

reasonably believed the alleged victim was 17 years old at the time they had intercourse and

(2) the prosecutor improperly bolstered the credibility of the alleged victim by (a) personally

vouching for the alleged victim's testimony during closing arguments, (b) arguing the alleged

victim made prior consistent statements based on evidence outside of the record, and (c) using

*voir dire* to predispose the jurors into accepting the alleged victim's testimony. We address each

issue in turn.

¶ 75                     A. Excluded Witness Testimony

¶ 76        Defendant argues he was denied a fair trial where the trial court excluded critical

testimony from a defense witness that corroborated his defense claiming he reasonably believed

D.H. was 17 years old when they had intercourse. Specifically, defendant argues the trial court

erred when it prohibited Kendall Martin from testifying about a conversation he overheard between defendant and D.H. where defendant confronted D.H. about her being 16 years old and D.H. told defendant she was 18 years old. The State disagrees and argues the court did not err by excluding Martin's testimony about the conversation between defendant and D.H.

¶ 77 To preserve an error for consideration on appeal, a defendant must object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Failure to do so constitutes forfeiture. *Id.* However, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain error doctrine, defendant must first demonstrate a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If an error occurred, we will only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* Defendant forfeited this issue on appeal where he failed to raise the issue in a posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48. Thus, we turn to whether a clear or obvious error occurred.

¶ 78 *1. Clear or Obvious Error*

¶ 79 At trial, outside the presence of the jury, the State rested its case-in-chief and made the trial court aware of a potential issue with defense witness Martin due to his anticipated testimony being outside the scope of the disclosure originally given to the State. The State alleged Martin would testify about a conversation he overheard between defendant and D.H. where D.H. denied her real age and told defendant she was older than she was. The State argued

D.H. was not confronted with the statement while on the stand, and the State was unable to investigate the matter further.

¶ 80    Defense counsel explained the context of the conversation to the trial court. Specifically, Martin witnessed defendant confront D.H. at the Club about her age and D.H. told defendant she was 18 years old. The State argued Martin's testimony about the conversation was hearsay because D.H. was not confronted with the statement.

¶ 81    The trial court found Martin's anticipated testimony about the conversation he heard between defendant and D.H. constituted hearsay. Specifically, the court indicated:

> "[Martin's anticipated testimony about the conversation] would be a matter that the [S]tate would be prejudiced by not being able to— excuse me, having closed its case in chief and not having addressed the issue. Also, it's irrelevant as I will get to in just a minute here as to what impact it had upon Mr. Martin as far as the effect on that statement being allegedly made by the victim.
>
>     As it relates to the defendant, however, the analysis is different. If the defendant testifies that that statement was made by the alleged victim in this case, it is not being offered to prove the truth of the matter asserted. It would be admissible on a limited basis to show it's [*sic*] effect on the listener, that being the defendant, and why it is that he acted in the manner that he ultimately did. Credibility cuts both ways, basically, as far as the alleged victim and the defendant, and it's up to the jury to determine who to believe as far as what statements were made and

- 23 -

whether or not they were true.  So, no as to Martin; yes as to the

defendant."

The court clarified Martin could testify but he could not testify about the conversation he overheard and if defendant testified about the conversation, the State could call D.H. back to the stand to refute the statements.

¶ 82        Defendant argues Martin's anticipated testimony about the conversation he heard between defendant and D.H. was not hearsay.  In support of his argument, defendant cites *People v. Burgund*, 2016 IL App (5th) 130119, ¶¶ 198, 208, 66 N.E.3d 553 (The defendant sought to introduce out of court statements made by the victim's mother to a corroborating witness to prove the proposition that the victim's mother made the statements, making it more likely that she also made similar statements to defendant under similar circumstance.  The appellate court found the trial court improperly barred the witness testimony as impermissible hearsay.).  The State disagrees and argues Martin's testimony about the conversation was inadmissible hearsay.

¶ 83        Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.  Ill. R. Evid. 801(c) (eff. Jan. 1, 2011).  However, not all out-of-court statements are inadmissible hearsay.  *People v. Buffman*, 260 Ill. App. 3d 505, 511, 636 N.E.2d 783, 788 (1994).  Only those statements offered to prove the truth or falsity of the matter contained therein are subject to the hearsay rule.  *Id.*  "If an assertion is offered to prove that an event it describes occurred or did not occur, it is hearsay; conversely, if offered only for the *fact* that the declarant said those particular words, it clearly is admissible."  *Id.*  (Emphasis in original.) (citing *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963); see also Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 801.1 at 562-63, 570-71 (5th ed. 1990)).

- 24 -

¶ 84    Here, Martin's anticipated testimony about the conversation he heard between defendant and D.H. was not hearsay because his testimony was not being offered to prove the truth of the matter asserted. Rather, his testimony was being offered to establish D.H. told defendant that she was 18 years old. Martin's testimony would then corroborate defendant's defense that D.H. represented to him she was 17 years old turning 18 years old and that representation reasonably made defendant believe D.H. was at least 17 years old at the time they had intercourse. Martin's proposed testimony about the conversation between defendant and D.H. also would have called into question D.H.'s credibility where she testified she was 16 years old and that defendant knew she was not 17 years old or older.

¶ 85    While we find Martin's anticipated testimony was not hearsay, the trial court did not err by excluding Martin's testimony about the conversation he heard between defendant and D.H. The State became aware of Martin's anticipated testimony at the time it closed its case-in-chief. Therefore, the late notice deprived the State of sufficient time to investigate Martin's potential testimony, find other witnesses that may have overheard the conversation, and call those individuals to testify. Also, the evidence was conflicting with regard to whether other people were present during the conversation between defendant and D.H. when he confronted her about her age. According to defense counsel, Martin's anticipated testimony would indicate he was present for the conversation between D.H. and defendant, but defendant testified he and D.H. were alone.

¶ 86    Further, defendant did not place Martin on the stand and make an offer of proof with respect to Martin's anticipated testimony. While defense counsel alluded to that fact that Martin would testify to overhearing a conversation between D.H. and defendant about D.H.'s age, we do not know for certain that Martin would have testified that he overheard the

conversation or exactly what he heard. Moreover, we did not find Martin's trial testimony particularly strong given Martin had difficulty recalling the victim's name and ended up denying participating in the conversation regarding the victim's age where Martin testified he was playing basketball and not part of the conversation about the photograph. We also reject the notion that Martin served as a potential credible neutral witness who could corroborate defendant's story that he believed D.H. was at least 17. To the contrary, defendant testified to a close relationship with defendant. Martin described defendant as a "good friend" who he spoke to "[m]ore than a couple times a week." Specifically, Martin had known defendant since his sophomore year of high school.

¶ 87    Given the late disclosure depriving the State of sufficient time to rebut Martin's anticipated testimony, defendant's failure to make an offer of proof with respect to Martin's anticipated testimony, the inconsequential nature of Martin's actual trial testimony, and the potential credibility questions stemming from the relationship between defendant and Martin, we find the trial court did not err in excluding Martin's testimony that he overheard a conversation between D.H. and defendant about D.H.'s age. Accordingly, defendant fails to demonstrate a clear or obvious error to support his contention of plain error.

¶ 88                    2. *Ineffective Assistance of Counsel*

¶ 89    In the alternative, defendant argues he received ineffective assistance of trial counsel for failing to preserve in a posttrial motion defendant's claim that the trial court erred when it excluded Martin's testimony. Specifically, defendant argues had defense counsel discovered and disclosed Martin's proposed testimony before trial, properly argued that the evidence was not hearsay, and included that matter in a posttrial motion, the trial court would have admitted Martin's testimony. Defendant asserts counsel's failure to do so allowed the jury

- 26 -

to adjudicate defendant without critical testimony that corroborated his claim that D.H. misrepresented her age.

¶ 90     We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Id.* at 687.

¶ 91     Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38, 743 N.E.2d 521, 540 (2000). Prejudice results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different. *People v. Simms*, 192 Ill. 2d 348, 362, 736 N.E.2d 1092, 1106 (2000). Here, defendant is unable to establish prejudice.

¶ 92     We find trial counsel's failure to preserve in a posttrial motion defendant's claim the trial court erred when it excluded Martin's testimony did not prejudice defendant. As stated above, the trial court did not err in excluding Martin's anticipated testimony where Martin's trial testimony was not particularly strong and his relationship with defendant called into question his credibility. The jury could have found Martin's testimony unbelievable simply based on his close relationship with defendant. Further, the evidence conflicted as to whether people were present during the conversation between defendant and D.H. when he confronted her about her

age. According to defense counsel, Martin's anticipated testimony intended to allege he was present for the conversation between D.H. and defendant, but defendant testified he and D.H. were alone.

¶ 93    Defendant fails to show there is a reasonable probability that the result of the proceedings would have been different if counsel had preserved this issue and the jury heard Martin's anticipated testimony. Because the trial court did not err in excluding Martin's anticipated testimony, we conclude defendant's ineffective assistance claim fails where he cannot demonstrate prejudice under the *Strickland* analysis.

¶ 94                                B. Prosecutorial Misconduct

¶ 95    Last, defendant argues the prosecutor improperly bolstered the credibility of D.H. by (a) personally vouching for D.H.'s testimony during closing arguments, (b) arguing D.H. made prior consistent statements based on evidence outside of the record, and (c) using *voir dire* to predispose the jurors into accepting D.H.'s testimony. Specifically, defendant argues the prosecutor's actions individually and cumulatively prejudiced him. The State argues the prosecutor did not improperly bolster D.H.'s credibility during *voir dire* or closing argument.

¶ 96    Defendant failed to object to this issue at trial and raise this issue in a posttrial motion, rendering the issue forfeited. *Sebby*, 2017 IL 119445, ¶ 48. However, as stated above, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan 1, 1967). Thus, we first examine whether a clear or obvious error occurred. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 97                                1. *Closing Argument*

¶ 98    Defendant argues the prosecutor improperly bolstered the credibility of D.H. by personally vouching for D.H.'s testimony during closing argument. The State disagrees and

argues the prosecutor did not personally vouch for D.H.'s credibility during closing argument. Further, the State contends the arguments made during closing argument must be viewed in their entirety.

¶ 99 "Prosecutors are afforded wide latitude during closing argument and may properly comment on the evidence presented and reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite a response, and comment on the credibility of the witness." *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47, 115 N.E.3d 270. "Prosecutors breach that latitude when they express personal beliefs or opinions or invoke the State's Attorney's office's integrity, to vouch for a witness's credibility." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66, 44 N.E.3d 632 (citing *People v. Boling*, 2014 IL App (4th) 120634, ¶ 126, 8 N.E.3d 65). "[I]n reviewing allegations of prosecutorial misconduct, the arguments of both the prosecutor and the defense counsel must be examined in their entirety and the allegedly improper remarks must be placed in the proper context." *People v. Campbell*, 332 Ill. App. 3d 721, 727, 773 N.E.2d 776, 781 (2002) (citing *People v. Westbrook*, 262 Ill. App. 3d 836, 856, 635 N.E.2d 398, 411 (1992)). "Reversal is not warranted unless the improper remarks result in substantial prejudice to the defendant." *Wilson*, 2015 IL App (4th) 130512, ¶ 66.

¶ 100 During closing arguments, the prosecutor in rebuttal stated,

"Ladies and gentlemen, I understand that defense counsel's questioning that were asked of the victim in this case, but I would make the comment that I would ask you to remember her demeanor on the stand. She was having a difficult time testifying as to what happened to her. I felt like she was being exceptionally truthful on the stand."

- 29 -

Defendant argues the prosecutor's statement "I felt like she was being exceptionally truthful on the stand" was improper. Specifically, defendant asserts the prosecutor's statement improperly expressed a personal opinion on D.H.'s testimony and her credibility and vouched for D.H.'s explanation of what happened between her and defendant. In support of his argument, defendant cites *Boling*, 2014 IL App (4th) 120634, ¶ 127, where this court found the statement "I do think [K.A.'s] statements are credible" improperly expressed the prosecutor's opinion on K.A.'s credibility.

¶ 101    While the prosecutor should not have used the statement starting with "I," we find the prosecutor's statement was of little significance in the overall context of his closing argument. When viewing the closing argument in its entirety, the prosecutor's statement rebutted defense counsel's remarks that D.H.'s testimony was not truthful. Specifically, defense counsel stated, "Now we know that [D.H. is] not being truthful." The prosecutor further addressed inconsistencies in defendant's testimony compared to D.H.'s testimony. Moreover, prior to closing argument, the trial court instructed the jury that what any attorney says during closing argument is not evidence and should not be considered as such. We do not find a single statement in response to defense counsel's assertion about D.H.'s truthfulness amounted to the prosecutor vouching for D.H.'s credibility. Accordingly, defendant fails to demonstrate a clear or obvious error occurred.

¶ 102    2. *Prior Consistent Statements Outside the Record*

¶ 103    Defendant next argues the prosecutor improperly bolstered the credibility of D.H. when the prosecutor argued D.H. made prior consistent statements based on evidence outside of the record. While the State does not address defendant's claim that the prosecutor used D.H.'s

purportedly prior consistent statements that were outside the record to bolster D.H.'s trial testimony, we analyze the issue below.

¶ 104        It is improper for a prosecutor to argue facts not in evidence. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47; *People v. Burton*, 63 Ill. App. 3d 915, 919, 380 N.E.2d 929, 932 (1978). As a result, when a witness's prior statement is not admitted into evidence, the prosecutor should refrain from attempting to improperly argue that his witness made prior consistent statements. See *People v. Adams*, 2012 IL 111168, ¶ 26, 962 N.E.2d 410. A defendant's right to a fair trial is violated by the prosecutor's actions in making the jury aware that defense counsel had access to prior statements of a witness but failed to impeach the witness's testimony from those materials. See *People v. Suggs*, 50 Ill App. 3d 778, 783-84, 365 N.E.2d 1118, 1121 (1977).

¶ 105        During closing argument, the prosecutor in rebuttal addressed inconsistencies in defendant's testimony compared to D.H.'s testimony. In doing so, the prosecutor pointed out that during trial, defense counsel tried to find inconsistencies in D.H.'s testimony compared with the information she previously provided during her police interview with Detective Maas. Specifically, the prosecutor stated,

> "As you can remember, when [D.H.] takes the stand and is
> being questioned by defense counsel, they were pointing out
> inaccuracies with her testimony based off of the information as
> provided to Detective Maas at the Children's Advocacy Center
> back in May of 2018. So [D.H.], obviously, had this interview
> with Detective Maas, she testifies here in court, defense counsel is
> then capable attempting to impeach her, they caught
> inconsistencies in those statements. So the interview at the CAC

took place back in May of 2018 and it is now May of 2019, and the number of inconsistencies that we saw in the testimony of [D.H.] explained that she was sexually assaulted amounted to the following.

Was she set down on the ground by the defendant after he walked her over to the grassy area or did she walk there herself and sit down? Were her underpants taken completely off of her body during the sexual assault or were her pants taken off and her underpants moved to the side during the oral sex and sexual assault during the sexual intercourse? That is the total number of inconsistencies that were presented to you by the defense of [D.H.'s] testimony related to her sexual assault from November 16 of 2017.

Two, the number of inconsistencies from the defendant in this case just related to his talking to Detective Maas to meet up to talk about the investigation amounted to approximately 10. ***.

*** 

So [D.H.'s] testimony, the inconsistencies in her story amount to literally nothing, and just that small snippet of the story of the defendant in this case, multiple inconsistencies. And then you watch his interview. You watched it; you read the transcript yesterday. You see him testify here today. The number of inconsistencies, ladies and gentlemen, I apologize if I get heated

and animated, it was mind blowing to hear that testimony today. 'I wasn't presented with the opportunity to give my information to Detective Maas that day.' Yes, you were. We saw it on screen multiple times. 'Be honest. Tell me what's going on.' 'No opportunity.' 'It was because I was playing with him.'

Shall I continue and address all the inconsistencies? For starters, he worked at the Boys and Girls Club for two years. He's been there since September. Known [D.H.] the entirety of 2017 and built up our relationship. He met her in October or September. That's in the first five seconds of the interview."

D.H.'s recorded police interview was not admitted into evidence.

¶ 106    Defendant argues the prosecutor during closing argument asked the jury to infer from the defense counsel's failure to impeach the entirety of D.H.'s in-court testimony that the remainder of her testimony was consistent with her statements in her interview with Detective Maas. Because D.H.'s police interview was not admitted into evidence, defendant argues it was complete speculation to assume that the rest of her testimony was consistent with her statements in the interview. Defendant asserts the prosecutor's statements bolstered D.H.'s credibility.

¶ 107    While D.H.'s police interview was not admitted into evidence, D.H. testified during direct examination that Detective Maas interviewed her about the sexual assault. Then, on cross-examination, defense counsel attempted to impeach D.H. with prior statements she made during her police interview. Specifically, D.H. testified she did not recall telling Detective Maas that on the night of November 16, 2017, defendant carried her all the way up the hill, threw her down on the ground, and did not remove her underwear but pushed her panties to the side.

D.H. testified defendant did not take her underwear or pants completely off during the intercourse.

¶ 108        As stated above, "Prosecutors are afforded wide latitude during closing argument and may properly comment on the evidence presented and reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite a response, and comment on the credibility of the witness." *Marzonie*, 2018 IL App (4th) 160107, ¶ 47. We find the prosecutor's statements during closing argument did not amount to the prosecutor improperly bolstering D.H.'s credibility. The prosecutor did not emphasize D.H.'s prior consistent testimony. Rather, the prosecutor was simply responding to defense counsel's cross-examination where he called into question D.H.'s credibility based on inconsistencies in her trial testimony compared to statements in her police interview. The prosecutor never directly addressed evidence outside the record. Moreover, prior to closing argument, the trial court properly instructed the jury that closing arguments are not evidence and any statement or argument made by an attorney which is not based on the evidence should be disregarded.

¶ 109        We find the prosecutor did not err in addressing D.H.'s prior consistent statements based on evidence outside of the record where defense counsel cross-examined D.H. on statements she made during her police interview. Accordingly, defendant fails to demonstrate a clear or obvious error occurred.

¶ 110                                      3. *Voir Dire*

¶ 111        Last, defendant argues the prosecutor improperly bolstered D.H.'s credibility by using *voir dire* to predispose the jurors into accepting D.H.'s testimony. The State argues the prosecutor did not improperly bolster D.H.'s credibility during *voir dire* because the prosecutor's line of questioning was not fact-driven toward the State's theory at trial.

¶ 112        " 'The purpose of *voir dire* examination is to assure selection of an impartial jury;

it is not to be used as a means of indoctrinating a jury, or impaneling a jury with a particular

predisposition.' " *People v. Mapp*, 283 Ill. App. 3d 979, 986, 670 N.E.2d 852, 857 (1996)

(quoting *People v. Bowel*, 111 Ill. 2d 58, 64, 488 N.E.2d 995, 998 (1986)). "[V]oir dire should

not be converted into a 'vehicle for pre-educating and indoctrinating prospective jurors as to a

particular theory or defense or impaneling a jury with particular predisposition.' " *Id.* (quoting

*People v. Kendricks*, 121 Ill. App. 3d 442, 449, 459 N.E.2d 1137, 1142 (1984)).

¶ 113        During *voir dire*, the prosecutor asked potential jurors about their possible

responses to a mass shooting.  Specifically, the prosecutor stated,

> "All right, folks, this next question, I'm definitely not
>
> trying [to] bring up anything that makes anybody uncomfortable,
>
> but could you raise your hands—the folks sitting up here in this
>
> jury box, could you raise your hand if you remember the 2012
>
> mass shooting that took place in Aurora, Colorado, inside of a
>
> movie theater, if you remember that incident happening in the
>
> United States of America.  ***.
>
>      ***
>
> So it looks like everybody raised their hand related to that
>
> question.  So, ladies and gentlemen, obviously unfortunately in
>
> society today mass shootings are a fairly frequent occurrence.  And
>
> the reason I bring that up is my next question is could you raise
>
> your hand if you've though about what you would do personally if
>
> you were in a mass shooting situation?  Could you raise your hand

- 35 -

if you ever thought about what you would do in a mass shooting

situation?"

The prosecutor then informed jurors that there were three possible victim reactions to a mass

shooting: (1) confront the mass shooter, (2) flee from the mass shooter, and (3) uncertain how

one would react to a mass shooter. For each possible response, the prosecutor had the jurors

affirmatively raise their hands to demonstrate how they would react to a mass shooter. The

prosecutor asked the same set of questions to a second group of prospective jurors. The parties

selected jurors from the two groups.

¶ 114        Defendant argues the prosecutor's line of questioning during *voir dire* improperly

indoctrinated and conditioned the prospective jurors to believe D.H.'s testimony by using a

lengthy hypothetical emphasizing different victim responses to the tragic events of a mass

shooting. Specifically, the prosecutor's use of a hypothetical predisposed the jurors to accept

D.H.'s demeanor and believe her testimony at trial. Further, defendant argues the prosecutor

compounded this error during opening statements when the prosecutor reminded the jurors of

their different responses to the mass shooting question during *voir dire* and to remember their

responses when observing D.H. testify. Specifically, the prosecutor stated,

> "I want you to keep in mind that [D.H.] at the time this
>
> happened was just sixteen years old. She may not act the way that
>
> you expect a typical sexual assault survivor to act. Going back to
>
> the Colorado shooting example when you guys were all selected
>
> through the jury selection process, each one of you had a different
>
> reaction to how exactly you would react in that situation. I want
>
> you to keep that in mind when [D.H.] is testifying in front of you.

Because she was a child when this happened, she may react a little bit differently by laughing nervously. She has a tendency to smile at awkward times. She understands the gravity of what happened to her, even though she was young at the time that it happened and she's embarrassed to talk about it. I'm confident you'll find her account of what happened to be authentic and the details to be compelling."

In support of his argument, defendant cites *People v. Bell*, 152 Ill. App. 3d 1007, 505 N.E.2d 365 (1987). We find *Bell* distinguishable.

"In *Bell*, the defendant was charged with the murders of his parents. During *voir dire*, the State asked a majority of the potential jurors whether they believed that people have a natural impulse to confess their wrongdoings, and whether they believed that a person could carry out a plan to murder a family member as a solution to problems in that relationship. The defendant did not object to these questions. He was convicted. On appeal, the appellate court chose to address the issue on the merits, and held that the questions were improper 'because they served primarily to indoctrinate the jurors as to the State's theory at trial and asked them to prejudge the facts of the case.' " *People v. Rinehart*, 2012 IL 111719, ¶ 19, 962 N.E.2d 444 (quoting *Bell*, 152 Ill. App. 3d at 1017).

¶ 115    Based on the record, we find the prosecutor's line of questioning during *voir dire* did not improperly indoctrinate or condition the prospective jurors to believe D.H.'s testimony. The prosecutor's hypothetical was not based on the State's theory of the case or fact-driven. Rather, the prosecutor's questions focused on the potential jurors' possible reaction to a traumatic experience. Frankly, the hypothetical, though somewhat lengthy and based on events completely unrelated to the case, rightfully fostered the State's legitimate attempt to identify prospective jurors who might hold set views on how a victim of a sexual assault should react and present on the witness stand if he or she is telling the truth. Where the prosecutor's line of questioning did not relate to the facts of the case or the State's theory of the case, we find the prosecutor did not improperly bolster D.H.'s credibility during *voir dire*.

¶ 116    Further, where the prosecutor did not err during *voir dire* by using a hypothetical to gauge prospective jurors' reactions to a traumatic event, the prosecutor's reference to the hypothetical during opening statements was not improper. Accordingly, defendant fails to demonstrate a clear or obvious error to support his contention of plain error.

¶ 117    Because we find no clear or obvious error where the prosecutor did not improperly bolster the credibility of the victim during trial, we decline to address any cumulative error claim.

¶ 118                    4. *Ineffective Assistance of Counsel*

¶ 119    In the alternative, defendant argues he received ineffective assistance of trial counsel where his trial counsel permitted the prosecutor to improperly bolster the credibility of the alleged victim throughout trial as described above.

¶ 120    To succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the

deficient performance prejudiced the defendant. *Strickland,* 466 U.S. at 687. "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *Hall*, 194 Ill. 2d at 337-38. Prejudice results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different. *Simms*, 192 Ill. 2d at 362. Here, defendant is unable to establish prejudice.

¶ 121    Defendant fails to show there is a reasonable probability that the result of the proceedings would have been different if counsel would have objected and argued the prosecutor improperly bolstered the credibility of the alleged victim throughout the trial. Because the prosecutor did not improperly bolster the credibility of the victim, we conclude defendant's ineffective assistance claim fails where he cannot demonstrate prejudice under the *Strickland* analysis.

¶ 122                               III. CONCLUSION

¶ 123    For the reasons stated, we affirm the trial court's judgment.

¶ 124    Affirmed.